Patricia M. WOOD, Francis X. Wood, and Elizabeth Wood, Plaintiffs,

v.

GENERAL MOTORS CORPORATION, Defendant.

Civ. A. No. 84–1566–Y.

United States District Court, D. Massachusetts.

May 8, 1987.

Moquin & Daley, Edmund P. Daley, Boston, Mass., for plaintiffs.

John A.K. Grunert, Richard P. Campbell, Campbell and Associates, Boston, Mass., for defendant.

### MEMORANDUM OF DECISION ON THE MOTIONS OF THE DEFENDANT TO DISMISS AND FOR SUMMARY JUDGMENT

YOUNG, District Judge.

The plaintiffs Francis and Elizabeth Wood and their daughter Patricia initiated this diversity action after Patricia Wood suffered severe injuries as a result of an accident in an automobile manufactured by the defendant General Motors Corporation ("General Motors").

### I.

For the purposes of addressing the present motions to dismiss and for summary judgment, the facts are straight-forward and essentially undisputed. On May 19, 1981, Patricia Wood was on her way home from school, riding as a passenger in a 1976 General Motors Blazer. Wood was seated, apparently unbelted, in the front seat. The vehicle, while travelling in excess of thirty miles per hour, collided head on into a roadside tree. Wood suffered a broken neck and was rendered quadriplegic. On May 18, 1984, she and her parents commenced this action.

The Woods' products liability action alleges that General Motors' automobile was, when manufactured and released from the factory, in a defective condition and unreasonably dangerous to the user. The Woods' theory is that General Motors' failure to install a passive restraint system, specifically the failure to equip the automobile with air bags or automatic seatbelts, rendered the car defective and this defect caused the Woods to suffer their injuries. The Woods claim that their injuries are due to General Motors' negligence, breach of the implied warranty of merchantability, Mass.Gen.Laws ch. 106, § 2–314(2)(c), and conduct in violation of Mass.Gen.Laws ch. 93A, §§ 2 and 9. Moreover, Francis and Elizabeth Wood both claim injuries based upon a loss of consortium theory.[1]

General Motors has filed a motion for summary judgment on the negligence, breach of warranty, and chapter 93A claims and a motion to dismiss the loss of consortium claim. General Motors contends that its summary judgment motion should be granted because the Woods' claims are preempted by the National Traffic and Motor Vehicle Safety Act ("Safety Act"), 15 U.S.C. §§ 1381–1420 (1982 & Supp.1987) and the regulations promulgated thereunder. General Motors also contends that the tort law of Massachusetts recognizes neither the claim that the lack of passive restraint systems can ren-

---

1. This Court has previously dismissed their claim for the negligent infliction of emotional distress. For an excellent, nation-wide synthesis of the evolving law in this area, *see* S. Plot-kin, *The Evolution of Tort Liability for Psychic Injuries: A Proposal to Protect Relational Interests* (1986) (unpublished thesis on file at the University of Virginia School of Law).

der a motor vehicle unreasonably dangerous nor, in the circumstances of this case, the claim for loss of consortium. There is considerable thoughtful support for General Motors' position on the preemption issue,[2] no specific Massachusetts guidance on the issue whether breach of warranty can be premised on the absence of passive restraints, and scant and contradictory lower court precedent concerning the recognition of a claim for loss of consortium in these circumstances.[3] Even so, after careful reflection, this Court concludes that General Motors' motions ought be denied and the case ought stand for trial.

## II.

### THE SAFETY ACT

Congress established the National Traffic and Motor Vehicle Safety Act, 15 U.S.C. §§ 1381–1420 (1966), in response to the "soaring rate of death and debilitation on the Nation's highways." S.Rep. No. 1301, 89th Cong.2d Sess., *reprinted in* 1966 U.S. Code Cong. & Ad. News, 2709, 2709 (hereinafter S.Rep. No. 1301). Section 1381, the Congressional declaration of purpose, declares that the "purpose of this chapter is to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents." 15 U.S.C. § 1381 (1982). The legislation places the "primary responsibility" for establishing safety standards on the federal government. The role of the

states in the motor vehicle safety regulatory scheme is set forth in § 1392(d):

Whenever a Federal motor vehicle safety standard established under this subchapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal standard. Nothing in this section shall be construed as preventing any State from enforcing any safety standard which is identical to a Federal safety standard. Nothing in this section shall be construed to prevent the Federal Government or the government of any State or political subdivision thereof from establishing a safety requirement applicable to motor vehicles or motor vehicle equipment procured for its own use if such requirement imposes a higher standard of performance than that required to comply with the otherwise applicable Federal standard.

Thus, states are not preempted from enforcing safety standards identical to federal standards. In essence, the states' regulations should complement the federal regulatory scheme. S.Rep. No. 505, 97th Cong., 2d Sess., *reprinted in* 1982 U.S. Code Cong. & Ad. News, 3169, 3174. Not only do states have the authority to estab-

---

2. *Wattelet v. Toyota Motor Corp.*, 676 F.Supp. 1039 (D.Mont.1987) (order of court); *Doty v. McMahon*, No. 85–3591, slip op. (D.D.C. Feb. 4, 1987) [Available on WESTLAW, 1987 WL 31143]; *Hughes v. Ford Motor Co.*, No. 84–1049, slip op. (D.Conn. Jan. 5, 1987) (adopting Magistrate's ruling that decided issue on Connecticut state tort law grounds); *Baird v. General Motors Corp.*, 654 F.Supp. 28 (N.D.Ohio 1986); *Cox v. Baltimore County*, 646 F.Supp. 761 (D.Md.1986); *Vanover v. Ford Motor Co.*, 632 F.Supp. 1095 (E.D.Mo.1986); *Wickstrom v. Maplewood Toyota, Inc.*, No. 470771, slip op. (Minn.D.Ct. March 12, 1987). *But see Murphy v. Nissan Motor Corp.*, 650 F.Supp. 922 (E.D.N.Y.1987) (claim for defectively designed product on theory that seatbelts were ineffective when used in a reclining position where there are no additional safety features such as airbags); *see also* Note, *Air Bag Litigation: Plaintiffs, Start Your Engines*, 13 Pepperdine L.Rev. 1063, 1074 (1986) (reasoning in a conclu-

sory manner that compliance with the Administrator's safety standards does not exempt a manufacturer from state tort law liability for failing to install an air bag system).

3. *Compare Prince–Jackson v. Children's Hospital Medical Center*, No. 72769 (Mass.Superior Ct. April 8, 1985) (Young, J.) (opinion recognizing a parent's right at common law to sue for loss of consortium arising out of injuries to a minor child) *with Schebel v. General Motors Corp.*, No. 85–1574 (Mass.Superior Ct. June 25, 1986) (Murphy, J.) (order granting summary judgment against such a claim). *See Rogers v. Baker Industries*, No. 86–0395–MA, slip op. (D.Mass. August 20, 1986) (concluding, without reference to the decisions of the Massachusetts Superior Court, that the Massachusetts Supreme Judicial Court, when it comes to address the issue, will not recognize such a claim).

lish identical regulations, but also they may regulate on "aspects of performance" not specifically established by the federal government. *Chrysler Corp. v. Rhodes*, 416 F.2d 319 (1st Cir.1969) (where federal regulations did not deal with specific feature of safety lamp, states may regulate area). It is only when a federal standard deals with a specific "aspect of performance" of a vehicle or item of equipment that nonidentical state regulations are precluded. *Id.* at 325. Finally, Congress explicitly intended to retain state tort remedies. It enacted a "savings clause," § 1397(c), which provides that "[c]ompliance with any federal motor vehicle safety standard issued under this subchapter does not exempt any person from any liability under common law."

Congress implemented the motor vehicle safety standard plan by directing the Secretary of Transportation to establish federal standards. 15 U.S.C. § 1392(a). The Secretary delegated this authority to the Administrator of the National Highway Traffic Safety Administration ("Administrator").[4] Pursuant to this authority, the Administrator issued Federal Motor Vehicle Safety Standard 208 ("Standard 208"), entitled "Occupant Crash Protection."

Standard 208 "bears a complex and convoluted history." *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 35, 103 S.Ct. 2856, 2862, 77 L.Ed.2d 443 (1983). As originally issued in 1967, Standard 208 required only the installation of seatbelts. 32 Fed.Reg. 2408, 2415 (1967). Due to the low levels of seatbelt usage, the Administrator amended Standard 208 in 1970 to include passive restraint requirements. 34 Fed.Reg. 11,148 (1969). The two forms of

passive restraints considered were "passive seat-belts" and airbags. Passive or automatic seatbelts are fastened to the interior of the door and deploy automatically when the door is closed by attaching to the car floor. Airbags are inflatable devices concealed in the dashboard and steering column that inflate automatically when a sensor indicates that the "deceleration forces from an accident have exceeded a preset minimum." *State Farm*, 463 U.S. at 35, 103 S.Ct. at 2862. In 1972, Standard 208 was amended to require the gradual phasing in of passive protection for all cars. For models made before August 1975, manufacturers were permitted to use manual belts with a warning or an "ignition interlock" system,[5] which prevented a car from starting until the belts were fastened. For models made after August 1975, the rule did not "dictate any particular form of passive protection, [but] ... established minimum criteria that cars would have to meet." *Pacific Legal Foundation v. Department of Transportation*, 593 F.2d 1338, 1341 (D.C.Cir.) *cert. denied*, 444 U.S. 830, 100 S.Ct. 57, 62 L.Ed.2d 38 (1979). In 1975, the imposition of the mandatory passive restraint system was postponed until August, 1976. 40 Fed.Reg. 16,217 (1975).

Then, in June, 1976, the Secretary of Transportation suspended the passive restraint requirement and extended the optional alternatives indefinitely.[6] The Secretary feared public hostility against the new systems. *State Farm*, 463 U.S. at 37, 103 S.Ct. at 2863 (citing Secretary Coleman's Decision of Dec. 6, 1976). The Secretary's successor disagreed and reimposed the mandatory requirement four months later. 42 Fed.Reg. 34,289 (1976). The new standard mandated the phasing in of passive

---

4. This opinion uses the word "Administrator" generally to refer to the Administrator himself and also to the National Highway Traffic Safety Administration, its predecessor, the National Highway Traffic Safety Bureau, the Department of Transportation, and the Secretary of Transportation.

5. The ignition interlock system was prohibited by Congress in 1974 in an amendment to the Safety Act that also provided that any future safety standards other than seatbelts would have to be submitted to Congress where they would

be subject to legislative veto. 15 U.S.C. § 1410(b). The legislative veto provision is apparently unconstitutional in light of *Immigration and Naturalization Service v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983).

6. General Motors, through the affidavit of Jeffrey L. Pearson, states that the 1976 Blazer in question was assembled in August, 1976, making the optional alternative regulations those applicable at the time of manufacture.

restraints between 1982 and 1984. The standard was submitted to Congress in accordance with 15 U.S.C. § 1410(b), where no action was taken. S.Rep. No. 481, 95th Cong., 1st Sess. (1977) (the Senate Committee on Commerce, Science, and Transportation held four days of hearings and issued a report endorsing the standard).

In 1981, the Administrator rescinded the passive restraint requirements. The Supreme Court, in *State Farm*, held that the rescission was arbitrary and capricious and remanded the matter to the Administrator for further consideration. *State Farm*, 463 U.S. at 57, 103 S.Ct. at 2874. In response, the Administrator reimposed the passive restraint requirement with phasing-in to begin on September 1, 1986 and becoming mandatory by September 1, 1989 unless states with populations aggregating two thirds of the nation's total population pass mandatory seatbelt use laws by April, 1989. 49 Fed.Reg. 28,962, 28,963 (1984). A recent challenge to the Administrator's decision was judged not ripe by the United States Court of Appeals for the District of Columbia. *State Farm Mutual Automobile Insurance Co. v. Dole*, 802 F.2d 474 (D.C.Cir.1986), *cert. denied, New York v. Dole*, — U.S. ——, 107 S.Ct. 1616, 94 L.Ed.2d 800 (1987).

The options provided by Standard 208 in August, 1976 are nearly identical to those applicable today. Standard 208 provides that manufacturers may comply by utilizing one of several options. See 49 C.F.R. § 571.208 (1985).[7] For automobiles manufactured during the relevant time period for this litigation, a manufacturer may comply by providing a complete passive protection system, a head-on protection system, or a lap and shoulder protection system. *Id.* § 571.208–S4.1.2. Simplified, the first option requires full air bag protection; the second option requires only frontal air bag protection; and the third option re-

quires protection of the occupant by a lap and shoulder belt apparatus. *Id.*

General Motors chose to comply with Standard 208 by implementing the third option. Wood contends that the 1976 Blazer was unreasonably dangerous and defective because it was not equipped with a passive restraint system, either under option one, two, or some other comparable design. General Motors argues that it complied with a federal safety standard option that preempts any state regulation on the same aspect of performance, and that a judgment of liability in tort for failure to provide air bags would, according to General Motors, effectively impose a non-identical safety standard in contravention of the intention of Congress as expressed in 15 U.S.C. § 1392(d).

## III.

### PREEMPTION

Federal law may preempt state law in several ways. First, Congress may include express preemption language in the statute. *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). Second, if express preemption language is absent, Congress may nonetheless imply preemption by evidencing an intent to "occupy a given field" thereby precluding any state law within that field. *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984). Congress' intent to occupy a field can be determined by the pervasiveness of the federal scheme, the dominance of the federal interest, or the objectives of the federal law. *Id.; Fidelity Federal Savings & Loan Ass'n v. De La Cuesta*, 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947).[8] Third, where Congress has not

---

7. General Motors' 1976 Blazer, a multipurpose passenger vehicle manufactured between January 1, 1976 and August 14, 1977, having a gross vehicle weight rating of 10,000 pounds or less, is covered by 49 C.F.R. § 571.208—S4.2.2. (1985). The regulations applicable to the 1976 Blazer have remained essentially unchanged although the requirements for the first option, S4.1.2.1.,

have been amended with respect to complete automatic protection systems. This minor change is irrelevant for the purpose of preemption analysis.

8. General Motors has indicated in its brief that this form of preemption is not relevant to the Safety Act. Given that Congress expressly per-

entirely superseded state regulation in a specific area, "state law is still preempted to the extent it actually conflicts with federal law." *Silkwood*, 464 U.S. at 248, 104 S.Ct. at 621. Actual conflict arises when "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), or "where state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Silkwood*, 464 U.S. at 248, 104 S.Ct. at 621 (citing *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 [1941] ). *See generally Massachusetts Medical Society v. Dukakis*, 815 F.2d 790, 791–792 (1st Cir.1987).

■ Before applying these principles, this Court notes that federal regulations have the same preemptive effect as federal statutes. *De La Cuesta*, 458 U.S. at 153, 102 S.Ct. at 3022 (Assuming the regulatory agency did not exceed its authority, "[f]ederal regulations have no less pre-emptive effect than federal statutes.").[9] Also, when deciding whether Congress intended to preempt state law, this Court must be mindful of the presumption that "Congress did not intend to displace state law," *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576 (1981), and that it should not disturb unnecessarily the federal-state balance. *Palmer v. Liggett Group, Inc.*, 633 F.Supp. 1171, 1173 (D.Mass.1986) (citing *Maryland v. Louisiana* ).

A. *Express Preemption*

■ General Motors argues that § 1392(d) expressly preempts "implicit reg-

ulation" based upon theories of common law liability such as that asserted in the instant case by the Woods. The language of § 1392(d) does not compel giving such a broad sweep to the concept of regulation by means of safety standards. It states that "no States ... shall have the authority ... to establish ... any safety standards applicable to the same aspect of performance of such vehicle ... not identical to the Federal standard." Federal motor vehicle safety standards are minimum standards for motor vehicle performance. 15 U.S.C. § 1391(2). The federal standards are established by a regulatory agency, subject to judicial review. Noncompliance with the federal safety standards constitutes a violation punishable by civil penalties and the imposition of injunctive relief. 15 U.S.C. §§ 1392, 1394, 1998–99. Noncompliance with federal safety standards prior to sale by a dealer also subjects the manufacturer to the duty of repurchasing the vehicle or replacing the parts not in compliance with appropriate equipment. 15 U.S.C. § 1400. An award of common law damages does not invoke this panopoly of sanctions and prohibitions. Rather, it is aimed at compensating a victim injured by tortious conduct. The manufacturer need not alter its future conduct but instead may choose only to compensate the individual victim. This is not the situation with a violation of the Safety Act. In the case of noncompliance, the manufacturer *must* repurchase the vehicle or, at its own expense, furnish conforming replacement parts.[10]

Finally, the argument in favor of express preemption is severely undercut by § 1397(c), the savings clause of the Safety

---

mitted identical regulation, 15 U.S.C. § 1392(d), and that states may regulate areas not specifically addressed by Congress, *see Chrysler Corp. v. Rhodes*, 416 F.2d 319 (1st Cir.1969), it is apparent that Congress did not intend to occupy the entire field of motor vehicle safety.

9. In prescribing any standards under the Safety Act, the Administrator must consider whether the proposed standard is reasonable, practicable, appropriate, and whether it will contribute to carrying out the purposes of the Act. 15 U.S.C. § 1392(f). The Woods do not assert that the Administrator exceeded his authority or that

he in any way flouted the statutory guidelines. *Cf. State Farm*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (holding that the Administrator acted capriciously and arbitrarily).

10. General Motors contends, nonetheless, that this Court should conclude that the Safety Act expressly preempts any putative award because it will have *some* regulatory impact on its conduct. This argument is better conceptually understood as one calling for implied preemption and is addressed therefore in that portion of this opinion. *See infra* § B.2, pp. 1116–19.

Act, which explicitly provides for the continuation of common law liability: "Compliance with any Federal motor vehicle safety standard issued under this subchapter does not exempt any person from any liability under common law." The statutory preemptive language of § 1392(d) does not directly address state common law. *Cf. Cippollone v. Liggett Group, Inc.*, 789 F.2d 181, 185 (3d Cir.1986) (failure of preemptive language in federal Cigarette Labelling and Advertising Act to include a reference to state common law claims militated against express preemption), *cert. denied,* — U.S. —, 107 S.Ct. 907, 93 L.Ed. 2d 857 (1987); *Ferebee v. Chevron Chemical Co.*, 736 F.2d 1529, 1542–43 (D.C.Cir.) (same construction applied to Federal Insecticide, Fungicide, and Rodenticide Act preemption claim), *cert. denied,* 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984). Congress well knows how to expressly bar common law suits when it so desires. *See, e.g.,* Employee Retirement Income Security Act, 29 U.S.C. §§ 1001, 1144(a)(c)(1) (1985) (chapter supersedes all state laws including "laws, *decisions,* rules, regulations, or other State action having the effect of law") (emphasis added). The failure of this express exclusion combined with the existence of the savings clause and the presumption against preemption leads this Court to conclude that there is no express preemption here. *Baird v. General Motors Corp.*, 654 F.Supp. 28 (N.D.Ohio 1986).[11]

## B. *Implied Preemption*

Implied preemption based upon a conflict analysis is a two-part inquiry. Under the first prong, General Motors apparently argues that if it complies fully with federal Standard 208 and is nevertheless subjected to a state damage award because it did not pursue some other option favored by a jury, an "irreconcilable conflict" is produced, making it physically impossible to comply with both federal and state standards. Under the second prong, General Motors

argues that the imposition of a state standard by way of a damages award would frustrate the objectives of the federal law. The Court addresses each argument in turn.

### 1. Impossibility

■ The inquiry under this prong is "whether there exists an *irreconcilable* conflict between the federal and state regulatory schemes. The existence of a *hypothetical* or *potential* conflict is insufficient to warrant the pre-emption of a statute." *Rice v. Norman Williams Co.*, 458 U.S. 654, 659, 102 S.Ct. 3294, 3299, 73 L.Ed.2d 1042 (1982) (In applying general preemption principles to antitrust law, the Supreme Court stated that "[a] party may successfully enjoin the enforcement of a state statute only if the statute on its face irreconcilably conflicts with federal antitrust policy") (emphasis added). The type of physical impossibility rising to the level of irreconcilable conflict is often presented where dual compliance with federal and state regulations cannot be legally achieved. In *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 143, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), a seminal case on conflict analysis, the Supreme Court gave an example of physical impossibility: "[I]f, for example, the federal orders forbade the picking and marketing of any avocado testing more than 7% oil, while the California test excluded from the State any avocado measuring less than 8% oil content," then physically impossible dual compliance would be presented.

General Motors contends that the imposition of common law liability would have the practical effect of eliminating its federally guaranteed options in occupant crashworthy restraint systems. Although such an imposition would not appear to create an "irreconcilable conflict" whereby dual compliance is "physically impossible," General Motors nonetheless argues that the imposition of such an award would produce a conflict forbidden by the Supreme Court's

---

11. *Vanover v. Ford Motor Co.*, 632 F.Supp. 1095 (E.D.Mo.1986) held that § 1392(d) did, in fact, expressly preempt state tort law liability in this area but the *Vanover* court made no reference to the savings clause and its discussion of the "regulatory impact" of a common law claim is better addressed as an implied preemption claim. *See infra* § B.2, pp. 1116–19.

holding in *Fidelity Federal Savings & Loan Ass'n v. De La Cuesta*, 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982). The Supreme Court, in *De La Cuesta*, specifically stated, however, that compliance with one of several options provided under the federal regulations and also with the state common law rule "may not be" a physical impossibility. *Id.* at 155, 102 S.Ct. at 3023. In *De La Cuesta*, the Supreme Court did not find preemption under the *Avocado Growers* impossibility test but rather under the second prong of the conflict analysis. *See, e.g., Hines v. Davidowitz*, 312 U.S. at 67, 61 S.Ct. at 404 (a state statute is preempted if it creates an "obstacle to the accomplishment and execution of the full purposes and objectives" of Congress). In any event, General Motors' argument directed to the physical impossibility of compliance is unavailing in light of the Supreme Court's holding and reasoning in *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984).

Prior to deciding *Silkwood*, the Supreme Court, in *Pacific Gas & Electric Co. v. State Energy Resources Conservation and Development Commission*, 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983), had ruled that the nuclear power field was occupied by the federal government and therefore any state regulation was preempted. In *Silkwood*, Kerr–McGee, the defendant and processor of certain nuclear materials including plutonium, was found liable in tort for punitive damages. The Supreme Court noted that Kerr–McGee's plant was covered by the federal nuclear licensing scheme. Kerr–McGee was not found to be in material violation of any of the federal agency's regulations. In fact, it had substantially complied with all the regulations.[12] Nevertheless, the Supreme Court refused to reverse the state jury award of punitive damages. While recognizing that there was "tension" between Kerr–McGee's compliance with the federal regulations and the imposition of the punitive damage award, the Supreme Court concluded that there was no preemptive conflict. An award of compensatory damages is certainly less onerous than one for punitive damages.[13] The purpose of such awards is foremost to compensate the victim and not to regulate standards of conduct.

Finally, impossibility of compliance arguments are usually founded on the assumption that compliance with one regulation, e.g., the state's, would preclude compliance with the other. Such is simply not the case here. *Ferebee*, 736 F.2d at 1543 (imposition of state award does not mandate a change in defendant's conduct since it may continue to comply with the federal standard and simultaneously pay the damage award); *Palmer*, 633 F.Supp. at 1177 ("The defendants' argument is fatally flawed in equating damage awards with direct regulation.... [D]efendants have a choice in deciding how to respond to potential or actual tort liability."); *Silkwood*, 464 U.S. at 264, 104 S.Ct. at 629 (Blackmun, J., dissenting) ("Whatever compensation standard a State imposes, whether it be negligence or strict liability, a licensee remains free to continue operating under federal standards and to pay for the injury that results. This pre-

12. *Silkwood v. Kerr–McGee Corp.*, 769 F.2d 1451, 1456 (10th Cir.1985) (on remand from Supreme Court), *cert. denied*, —— U.S. ——, 106 S.Ct. 1947, 90 L.Ed.2d 356 (1986). Contrary to the assertions of General Motors, Defendant's Supplemental Memorandum in Support of its Motion for Summary Judgment, 2, neither the Supreme Court nor the lower federal courts found any material violation. "[T]he only violations of federal regulations throughout the incident was [Kerr–McGee's] failure to maintain a record of the dates of two urine samples submitted by Ms. Silkwood." 769 F.2d at 1457 (citing *Silkwood*, 104 S.Ct. at 619); Easterbrook, *Foreward: The Court and the Economic Systems*, 98 Harv.L.Rev. 4, 43 (1984) ("The NRC concluded that the plant had complied with all

pertinent safety requirements; a jury concluded that it had not...."). In fact, the dissent in *Silkwood* explicitly focused on the lack of violations and the meticulous oversight of the plant by the Nuclear Regulatory Commission (then the Atomic Energy Commission). *Silkwood*, 464 U.S. at 277, 104 S.Ct. at 636 (Powell, J., dissenting); *id.* at 262, 104 S.Ct. at 628 (Blackmun, J., dissenting).

13. Mr. Justice Powell, dissenting in *Silkwood*, believes such awards present no element of regulation. 464 U.S. at 276 n. 3, 104 S.Ct. at 635 n. 3 ("There is no element of regulation when compensatory damages are awarded....").

sumably is what Congress had in mind when it preempted state authority to set administrative regulatory standards but left state compensatory schemes intact"). The potential for an award of compensatory damages under state law does not create an irreconcilable conflict with Standard 208. There is no preemption under this prong of the analysis.

2. Frustration of the Safety Act's Objectives

■ The Court approaches this second prong in the conflict analysis mindful of the Supreme Court's admonition that "courts should not assume the role which our system assigns to Congress." *Pacific Gas & Electric,* 461 U.S. at 223, 103 S.Ct. at 1732 (footnote omitted).

Deciding whether a state statute, or in this case, a state judgment finding tort liability, frustrates the full purposes of the legislation as envisioned by Congress first requires that this Court ascertain those purposes by construing the federal statute and regulations. The Court must then determine whether the state law poses an obstacle to those objectives. *See Perez v. Campbell,* 402 U.S. 637, 644, 91 S.Ct. 1704, 1708, 29 L.Ed.2d 233 (1971) (setting forth test in case involving state statute).

The Safety Act is predominantly concerned with decreasing the carnage resulting from automobile accidents where inadequate safety standards were followed by the industry and the user. S.Rep. No. 1301, 1966 U.S.Code Cong. & Ad.News at 2709–12; H.R.Rep. No. 1776, 89th Cong., 2d Sess. 16 (1966) ("Motor vehicle safety is the paramount purpose of this bill and each standard must be related thereto."). "[T]he Act was necessary because the industry was not sufficiently responsive to safety concerns. The Act intended that safety standards not depend on current technology and could be 'technology forcing' in the sense of inducing the development of superior safety design." *State Farm,* 463 U.S. at 49, 103 S.Ct. at 2870. The Administrator, consistent with this goal, stated that "[t]he explicit purpose of the Act [, ...] is to enable the Federal Government to impel automobile manufac-

turers to develop and apply new technology to the task of improving the safety design of automobiles as readily as possible." 42 Fed.Reg. 34,289, 34,293 (1977) (quoting *Chrysler Corp. v. Department of Transportation,* 472 F.2d. 659, 671 [6th Cir. 1972]). At the same time, a subsidiary purpose was Congress' intention that the safety standards be uniform throughout the country. It is unclear, however, the extent to which this purpose is an end in itself or an outgrowth of the two basic concerns that emerged from the committee's hearings. Those concerns were first, that the promotion of voluntary standards had largely failed and that swift mandatory standards were necessary and second, that the primary responsibility for regulating the automotive industry "must fall squarely upon the Federal Government." S.Rep. No. 1301, 1966 U.S.Code Cong. & Ad.News at 2712. In the same passage of the Senate Report in which the need for uniformity is expressed, Congress also expressed its concern that states not be precluded from regulating motor vehicle safety.

> The centralized, mass production, high volume character of the motor vehicle manufacturing industry in the United States requires that motor vehicle safety standards be not only strong and adequately enforced, but that they be uniform throughout the country. At the same time, the committee believes that the States should be free to adopt standards identical to the Federal standards....

> The States are also permitted to set more stringent requirements for purposes of their own procurement. *Moreover, the Federal minimum safety standards need not be interpreted as restricting State common law standards of care. Compliance with such standards would thus not necessarily shield any person from product liability at common law.*

*Id.* at 2720 (emphasis supplied). The Administrator, consistent with these objectives, promulgated Standard 208.

The specific goals of Standard 208, while comporting generally with the above di-

rectives, have not remained consistent throughout its regulatory history. As noted by Mr. Justice (now Chief Justice) Rehnquist, in his dissent in *State Farm,* "[t]he agency's changed view of the standard seems to be related to the election of a new President of a different political party." 463 U.S. at 59, 103 S.Ct. at 2875. As he there concluded, a change in administration "is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations." *Id.* (discussing rescission of mandatory requirement of passive restraint systems). The perturbations of the Administrators during the regulatory life of Standard 208 make it no easy matter, however, for this Court to glean the regulatory purpose. The Administrator has mandated passive restraint requirements because of their safety benefits, see 49 Fed.Reg. 28,962 (1984) (mandating requirement unless states covering two thirds of the nation's population impose mandatory seat belt use laws by 1989); 42 Fed.Reg. 34,289 (1976); postponed the requirement because of safety concerns, see 41 Fed.Reg. 24,070 (1976); postponed the requirement because of public hostility and effectiveness concerns, 49 Fed.Reg. 28,962 (1984); and rescinded it, on grounds later found to be arbitrary and capricious. 46 Fed.Reg. 53,419 (1981). Based upon a study of the Administrator's discussion of Standard 208, especially with respect to the "optional regulations" in effect in 1976 and still in force today, this Court cannot devine any purpose other than an appropriate concern with the imposition of reasonable, practicable, and objective safety standards. Such a purpose is not frustrated by the potential that a state damage award may occur. Regardless of the so-called "regulatory impact" of such an award, this Court cannot, keeping in mind the presumption against preemption,

find that the agency's and Congress' objectives would be thwarted, especially since Congress intended that "[c]ompliance with any Federal motor vehicle safety standard ... does not exempt any person from any liability under common law." 15 U.S.C. § 1397(c).

Congress passed the Safety Act fully aware that damage suits would be initiated against parties who complied with the federal regulations. *See Shipp v. General Motors Corp.,* 750 F.2d 418, 421 (5th Cir. 1985) ("Of course, compliance with such minimum safety standards does not exempt or immunize a manufacturer from common law strict liability.... Certainly Congress did not intend such a result...."). *See generally Larsen v. General Motors Corp.,* 391 F.2d 495 (8th Cir.1968) (seminal second collision case finding liability notwithstanding compliance with federal standards). This Court therefore concludes, as the Supreme Court did in *Silkwood,* that Congress recognized and sanctioned this "tension" between compliance with federal regulations and state common law claims. *See Palmer,* 633 F.Supp. at 1179 (citing and following *Silkwood* for similar reasons in not finding preemption by the Federal Cigarette Labeling and Advertising Act, 15 U.S.C. §§ 1331–41).

Even if this Court were to assume that the Administrator was predominantly concerned with the promulgation of uniform regulations with built in flexibility in deference to industry demands for a wide range of options, it nonetheless would conclude that the regulatory impact of a state damage award would not frustrate the full objectives of the Administrator and Congress. The Supreme Court has only recently addressed this issue and found that the impact of such awards should be considered narrowly.[14]

---

14. General Motors, in its argument for preemption, relies principally on *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 247, 79 S.Ct. 773, 780, 3 L.Ed.2d 775 (1959) and *Fidelity Federal Savings & Loan Ass'n v. De La Cuesta,* 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982), both decided before *Silkwood.* In *Garmon,* the Supreme Court stated that "regulation can be as effectively exerted through an award

of damages as through some form of preventive relief." 359 U.S. at 247, 79 S.Ct. at 780, *noted in Silkwood,* 464 U.S. at 249, 104 S.Ct. at 622. In *Garmon,* the Supreme Court held that the federal government occupied the field of National Labor Relations and that state law regulating conduct "only arguably protected by the National Labor Relations Act" is nonetheless preempted. The Supreme Court, in *Garmon,* was con-

In *Silkwood v. Kerr–McGee*, the Supreme Court ruled that simply because Congress occupied the nuclear energy field did not require a finding that it intended to preempt punitive damages awards. 464 U.S. at 256, 104 S.Ct. at 625. The Supreme Court dismissed Kerr–McGee's contention that the award frustrated Congress' desire to promote nuclear power. It ruled that Congress did not intend to promote nuclear power "at all costs." *Id.* at 257, 104 S.Ct. at 626. Congress was also concerned that nuclear power be developed safely. 42 U.S.C. § 2013(d). The Supreme Court inferred from this that Congress disclaimed any interest in promoting nuclear power at the expense of adequate remedies for those injured by exposure to nuclear materials. It concluded, therefore, that an award of punitive damages did not hinder the purposes of the Atomic Energy Act. 464 U.S. at 257, 104 S.Ct. at 626. The Supreme Court also concluded that the allowance of punitive damage awards did not frustrate Congress' express intent to preclude dual regulation of radiation hazards. *Id.* The Supreme Court reasoned that it was not within its authority to second-guess Congress' belief that it was not inconsistent to vest exclusive regulatory authority over the safety aspects of nuclear development with a federal agency, yet permit recovery

---

cerned that the National Labor Relations Board's ("NLRB") jurisdiction would be flouted if litigants sidestepped its remedial scheme and instead opted for bringing state law claims. Recently, the Supreme Court, while discussing the National Labor Relations Act ("NLRA") and *Garmon,* articulated the different standards applied when the NLRB is involved. "[A] presumption of federal preemption applies even when the state law regulates conduct only arguably protected by federal law. Such a pre-emption rule avoids the potential for jurisdictional conflict between state courts or agencies and the NLRB by ensuring that primary responsibility for interpreting and applying this body of labor law remains with the NLRB.... *Garmon,* 359 U.S. at 244–45, 79 S.Ct. at 779–80. This presumption of federal pre-emption [is] based on the primary jurisdiction rationale." *Brown v. Hotel & Restaurant Employees & Bartenders International Union Local 54,* 468 U.S. 491, 502, 104 S.Ct. 3179, 3186, 82 L.Ed.2d 373 (1984). Thus, the Supreme Court's concern in *Garmon* is better understood as one with the primary jurisdiction of the NLRB and the exclusive application of its remedial scheme. The NLRA provided a specific avenue for redress for the petitioner in *Garmon.* "The Court's discussion of pre-emption of state common law claims must be read with that in mind." *Palmer,* 633 F.Supp. at 1175 n. 3.

Normally, as in the case with the Safety Act, the presumption as to "arguably protected conduct" is just the opposite in preemption analysis. Further, the only relief for the Woods, where General Motors has complied with the federal safety regulation, is provided by a common law claim. *Cf.* 15 U.S.C. § 1400 (providing a cause of action for dealers where manufacturers fail to comply with the safety standards).

In *De La Cuesta,* the other Supreme Court case relied upon by General Motors, the issue was whether a judge made determination that due-on-sale clauses in mortgage contracts would not be enforced at the lender's option was preempted by federal regulations issued by the Federal Home Loan Bank Board ("Board"). The regulations provided that a federal savings and loan association had the power to include and enforce due-on-sale clauses contained in their loan instruments. The Supreme Court focused its attention on whether the Board intended to preempt California's *Wellenkamp* doctrine. The *Wellenkamp* rule, as announced by the California Supreme Court in *Wellenkamp v. Bank of America,* 21 Cal.3d 943, 148 Cal.Rptr. 379, 582 P.2d 970 (1978), forbade California courts from enforcing due-on-sale clauses solely at the option of the lender. 458 U.S. at 155, 102 S.Ct. at 3023. After noting that compliance with the Board's permissive regulation on due-on-sale clauses and the *Wellenkamp* rule may not be a physical impossibility, the Supreme Court concluded that the doctrine nonetheless created "an obstacle to the accomplishment and execution of the full purposes and objectives 'of the due-on-sale regulation.'" *Id.* at 156, 102 S.Ct. at 3024 (quoting *Hines,* 312 U.S. at 67, 61 S.Ct. at 404). In supporting its conclusion, the Supreme Court explained that the Board unequivocally expressed its determination to displace state law. The Supreme Court cited to the regulations' preamble and a recent pronouncement by the Board that due-on-sale practices "shall be governed *exclusively* by the Board's regulations in *preemption* of and without regard to any limitations imposed by state law...." *Id.* 458 U.S. at 158, 102 S.Ct. at 3025 (emphasis added) (citing 12 C.F.R. § 556.9(f)(2) (1982) and 41 Fed.Reg. 18,286, 18,287 [1976]).

The Board's intent to expressly preempt state law and to maintain flexibility for federal savings and loans is much more explicit than the purpose attributed to the Administrator by General Motors. Further, the impact of the *Wellenkamp* rule is much more certain and akin to state regulations since the California courts' had placed the petitioner on notice that its courts would not be an open forum for the enforcement of such clauses. Far less certainty is implicated by potential common law damage awards.

under state common law. In the case of the Safety Act, Congress was even more explicit in its acceptance of any possible inconsistencies between federal regulatory authority and recovery under state law in that it explicitly recognized the continuation of common law liability.

Further evidence of the Supreme Court's narrow view of the regulatory impact of common law damage awards is found in the dissents to *Silkwood.* While arguing against the majority's decision with respect to punitive damages, the four dissenters found no fault with the implicit conclusion that compensatory damages were not preempted. Justice Blackmun, writing for himself and Justice Marshall, stated that "[c]ompensatory damages therefore have an indirect impact on daily operations of a nuclear facility." 464 U.S. at 263, 104 S.Ct. at 629.[15] Justice Powell, writing for all four dissenters, was much more emphatic. He stated that "[t]here is no element of regulation when compensatory damages are awarded." *Id.* at 276 n. 3, 104 S.Ct. at 635 n. 3. In light of the Supreme Court's language, including that of the dissenters, and result in *Silkwood,* General Motor's argument for preemption is hardly compelling.

The combination of the Administrator's inconclusive purposes and the speculative nature of the regulatory impact of a potential award requires a ruling that neither Congress nor the Administrator intended to displace state common law awards.[16]

Based upon the foregoing, this Court denies General Motor's motion for summary judgment.

## III.

## MASSACHUSETTS PRODUCTS LIABILITY

General Motors' second contention is that this Court should conclude as matter of law that the failure to install a passive restraint system did not make the 1976 Blazer defective and unreasonably dangerous under Massachusetts case law. The Woods' claim, as both parties point out, is based upon what is known as a crashworthy or second collision theory. "Crashworthiness" has been recognized as a basis for liability in Massachusetts since at least 1978. *Back v. Wickes Corp.,* 375 Mass. 633, 378 N.E.2d 964 (1978) (motor home with built-in propensity to explode under certain crash conditions); *Smith v. Ariens Co.,* 375 Mass. 620, 623–25, 377 N.E.2d 954 (1978) (approving reasoning in *Larsen v. General Motors Corp.,* 391 F.2d 495 (8th Cir.1968) that enhanced or second collision injuries are foreseeable as incidental to normal use of certain products and therefore negligence principles impose liability for such injuries). The *Larsen* court had reasoned that an interior or second collision between a driver and the steering column upon front end impact was caused by a safety defect in the car's design.

Under Mass.Gen.Laws ch. 106, § 2–314(2)(c), a seller warrants its product as "fit for the ordinary purposes for which such goods are used," which include the "uses intended by the manufacturer and those which are reasonably foreseeable." *Hayes v. Ariens Co.,* 391 Mass. 407, 410, 462 N.E.2d 273 (1984) (citing *Back v. Wickes Corp.,* 375 Mass. at 643, 378 N.E.2d 964). A claim for breach of the implied warranty of merchantability focuses on whether the defect renders the product unreasonably dangerous and therefore unfit for its ordinary use or purpose. Warranty

15. While other portions of Justice Blackmun's opinion address the purpose of compensatory damages, *see, e.g.,* 464 U.S. at 263, 104 S.Ct. at 629 ("The crucial distinction between compensatory and punitive damages is that the purpose of punitive damages is to regulate safety, whereas the purpose of compensatory damages is to compensate victims") which purpose is arguably irrelevant to the regulatory effect of such awards, the quoted passage reflects Justice

Blackmun's concern with the *impact* or effect of such awards.

16. It is for Congress and not this Court to resolve the possible "limitless" regulatory consequences created by the "tension" on this particular regulatory scheme. *See Silkwood,* 464 U.S. at 256, 104 S.Ct. at 625; *Ferebee,* 736 F.2d at 1543; *Palmer,* 633 F.Supp. at 1179.

liability neither imposes absolute liability nor the obligation that a manufacturer of a motor vehicle make its product collision-proof. *Back*, 375 Mass. at 640, 378 N.E.2d 964. A manufacturer is not an insurer of its user's safety. Nonetheless, a manufacturer must "anticipate the environment in which its product will be used, and it must design against the reasonably foreseeable risks attending the product's use in that setting." *Id.* at 640–41, 378 N.E.2d 964.[17]

General Motors would have this Court rule, as matter of law, that the 1976 Blazer was fit for its intended purposes and therefore not defective. The question posed, however, is one that can only be properly answered by that most vital exercise of direct democracy—the American jury. "[T]he question of fitness for ordinary purposes is largely one centering around reasonable consumer expectations." *Venezia v. Miller Brewing Co.*, 626 F.2d 188, 190 (1st Cir.1980) (citing *Back*, 375 Mass. at 642, 378 N.E.2d 964) (deliberate misuse of otherwise reasonably safe product not an intended use within expectation of consumer).

In deciding this issue, the *jury* must weigh competing factors much as they would in determining the fault of the defendant in a negligence case ... the jury should consider, among other factors, "the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design."

*Back*, 375 Mass. at 642, 378 N.E.2d 964 (quoting *Barker v. Lull Engineering Co.*, 20 Cal.3d 413, 431, 143 Cal.Rptr. 225, 573 P.2d 443 [1978]) (emphasis added). The balancing test envisioned by the Supreme Judicial Court is to be conducted within the province of the jury and based upon evidence adduced at trial.[18] This Court cannot conclude at this preliminary stage that as matter of law the Woods cannot recover under Massachusetts case law for their injuries, whether under a negligence or a breach of implied warranty theory.[19]

■ General Motors' motion for partial summary judgment on the alleged violation of Mass.Gen.Laws ch. 93A is similarly denied since a finding by the jury that General Motors breached an implied warranty of merchantability would conclusively decide that ch. 93A, § 2 was violated. *Burnham v. Mark IV Homes, Inc.*, 387 Mass. 575, 581, 441 N.E.2d 1027 (1982) (citing *Hannon v. Original Gunite Aquatech Pools, Inc.*,

---

17. The Supreme Judicial Court has stated repeatedly that the remedy of warranty liability is "fully as comprehensive as that provided by § 402A of the Restatement [(Second)] of Torts (1965)]." *Mason v. General Motors Corp.*, 397 Mass. 183, 189, 490 N.E.2d 437 (1986) (quoting *Swartz v. General Motors Corp.*, 375 Mass. 628, 378 N.E.2d 61 [1978]).

18. Evidence on the economic and mechanical feasibility of airbags in 1976 is an example of the evidence to be weighed by the jury in deciding whether the 1976 Blazer was defective and unreasonably dangerous. At the same time, testimony that Patricia Wood was not wearing her seatbelt may be evidence of "unreasonably proceeding to use a product which [she knew] to be defective" thereby causing her to relinquish her protection under an implied warranty theory. *Correia v. Firestone Tire & Rubber Co.*, 388 Mass. 342, 446 N.E.2d 1033 (1983); *see Allen v. Chance Manufacturing Co.*, 398 Mass. 32, 494 N.E.2d 1324 (1986). Of course, this Court makes no ruling on any of these issues at this time.

19. This Court notes that neither party has requested certification of this issue to the Supreme Judicial Court pursuant to Rule 1:03 of the Rules of the Supreme Judicial Court of Massachusetts, nor does this Court believe that such an approach is warranted. While this Court is not aware of any reported case which holds that liability can be imposed upon a manufacturer for failing to equip a vehicle with a passive restraint system, *see Vanover v. Ford Motor Co.*, 632 F.Supp. 1095, 1098 (E.D.Mo. 1986) (granting summary judgment under Missouri law), there is also no impediment to such a theory under Massachusetts law. General Motors' reliance on *Mavilia v. Stoeger Industries*, 574 F.Supp. 107, 111 (D.Mass.1983) (granting summary judgment on the grounds that a handgun is not unreasonably dangerous) is inapposite due to the extremely different nature of the product involved in that case. Consumers expect that a gun may cause fatal injuries since that is one of its essential purposes. Consumers do not expect to encounter a similar high degree of risk of fatality when operating a motor vehicle.

385 Mass. 813, 821, 434 N.E.2d 611 [1982] [did not decide issue]); *Goldstein Oil Co. v. C.K. Smith Co.*, 20 Mass.App.Ct. 243, 247, 479 N.E.2d 728, *rev. denied*, 395 Mass. 1104, 482 N.E.2d 328 (1985); 940 C.M.R. § 3.08(2) (1978).

## IV.

## LOSS OF CONSORTIUM

■ General Motors contends that Francis and Elizabeth Wood have no legally cognizable claim for loss of consortium and that this aspect of their claim must necessarily be dismissed. The Woods oppose the motion arguing that, although Patricia Wood had reached the age of majority shortly before this incident, they should be allowed to recover for their loss under the factual circumstances presented. This is a matter of first impression in a rapidly evolving area of Massachusetts law.

At the time of her injury in May, 1981, Patricia Wood was an eighteen-year-old student residing with her parents and in need of their financial support. As a result of her injuries, the Woods allege that they have experienced severe emotional trauma and the loss of companionship and society of their daughter. The issue presented is whether parents have an independent cause of action for loss of consortium when tortious injury is inflicted upon their adult, but unemancipated child.

In *Ferriter v. Daniel O'Connell's Sons, Inc.*, 381 Mass. 507, 413 N.E.2d 690 (1980), Massachusetts became the first state in the nation to allow recovery for a minor child's loss of companionship and consortium of a parent. *See DeLoach v. Companhia de Navegacao Lloyd Brasileiro*, 782 F.2d 438, 440 (3d Cir.1986) (After *Ferriter*, "[i]n the next few years five other states followed that lead: Michigan, Iowa, Wisconsin, Washington, and Vermont").[20] In a recent Massachusetts Appeals Court decision, the court extended the reasoning of *Ferriter* to allow recovery by a handicapped adult for the loss of consortium of a parent. *Morgan v. Lalumiere*, 22 Mass.App.Ct. 262,

493 N.E.2d 206 *rev. denied*, 398 Mass. 1103, 497 N.E.2d 1096 (1986). The court stressed that its decision was consistent with the "humane policies" underlying *Ferriter*. Although Morgan was thirty years old at the time of the accident, and therefore not a minor, the court indicated that to focus on a particular age was arbitrary and less crucial than the circumstances surrounding the filial relationship. In *Morgan*, the child was severely handicapped, lived at home, and was cared for by his mother prior to her accident. Thus, he was dependent both for economic support and for "closeness, guidance, and nurture." *Ferriter*, 381 Mass. at 516, 413 N.E.2d 690, *quoted in Morgan*, 22 Mass.App.Ct. at 270, 493 N.E.2d 206.

Since Massachusetts will permit a minor child to recover for the loss of companionship and consortium of a parent, *Ferriter v. Daniel O'Connell's Son's, Inc.*, 381 Mass. 507, 413 N.E.2d 690 (1980), and has extended this right to recovery to a handicapped adult who has lost the consortium of a parent, *Morgan v. Lalumiere*, 22 Mass.App.Ct. 262, 493 N.E.2d 206, *rev. denied*, 398 Mass. 1103, 497 N.E.2d 1096 (1986), it remains to consider whether the reverse is true, i.e., whether in Massachusetts a parent may recover for the loss of companionship and consortium of an unemancipated child who has but recently attained the age of majority. Neither the Massachusetts Supreme Judicial Court nor the Massachusetts Appeals Court have yet addressed this question. "In such circumstances, it is appropriate to look to the decisions of the Massachusetts Superior Court, 'the great trial court of the Commonwealth,' as declarative of Massachusetts law," *Pierce v. Dew*, 626 F.Supp. 386, 387 (D.Mass.1986); *see Local Div. 589, Amalgamated Transit Union v. Massachusetts*, 666 F.2d 618, 626 n. 21, 645 (1st Cir.1981), *cert. denied*, 457 U.S. 1117, 102 S.Ct. 2928, 73 L.Ed.2d 1329 (1982); *Flotech, Inc. v. E.I. DuPont de Nemours Co.*, 627 F.Supp. 358, 372 (D.Mass.1985), *aff'd* 814 F.2d 775 (1st Cir.1987), especially where it

---

**20.** At least eight other courts that have addressed the issue since 1980 have denied recovery. *DeLoach*, 782 F.2d at 440.

has been expressly stated that a decision of the Superior Court, unless modified or reversed by a court of appropriate jurisdiction, is the law of the Commonwealth in the county in which it is rendered. *Commonwealth v. DeArmas*, 397 Mass. 167, 173, 490 N.E.2d 433 (1986) (Liacos, J., concurring).

On the issue of whether, in Massachusetts, a parent may recover for the loss of companionship and consortium of an unemancipated child, however, at least two justices of the Superior Court have reached different conclusions. In 1985, while serving as a justice of the Superior Court, I concluded "that the interests of justice and the mores of the Commonwealth require recognition of this tort." *Prince-Jackson v. Children's Hospital Medical Center*, No. 72943, slip op. (Mass.Superior Ct. April 8, 1985) (Young, J.); *accord Shockley v. Prier*, 66 Wis.2d 394, 225 N.W.2d 495 (1975). *But see* W. Prosser and W. Page Keeton, *The Law of Torts* § 125, at 934 (4th ed. 1984) ("Although the decision [in *Shockley*] has had the support of some writers, who have shown that the traditional arguments against recovery for loss of a child's society and affections are not always convincing, there is virtually no support for this kind of action in the courts....") (footnotes omitted). Indeed, in 1986, another justice of the Superior Court rejected a parent's claim for the loss of consortium for a minor child, *Schebel v. General Motors Corp.*, No. 85-1574 (Mass. Superior Ct. June 25, 1986) (Murphy, J.) (order granting summary judgment) and, more recently, a colleague on the District Court concluded that the Massachusetts appellate courts would not recognize such a right in parents to claim the loss of consortium of a minor child. *Rogers v. Baker Industries*, No. 86-0395-MA, slip op. (D. Mass. August 20, 1986).

It is important to understand the different perspective through which it is now my duty to view this issue. As a justice of the Superior Court—one of America's great common law courts—it was my duty, in the absence of appellate decisions on point, to declare the common law of the Commonwealth consistent with the mores and needs of her people. This I sought to do in *Prince-Jackson*. As a federal judge interpreting Massachusetts law in the absence of a controlling decision by the highest court of the Commonwealth, however, my function is only a predictive one, i.e., what will the Massachusetts Supreme Judicial Court declare when it eventually confronts this issue? *Commissioner v. Estate of Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967).

Engaging in this predictive function, this Court—at least at the present stage of this litigation—adheres to the decision in *Prince-Jackson*[21] and makes the "limited extension," *Morgan*, 22 Mass.App.Ct. at 270, 493 N.E.2d 206, of the policies underlying *Ferriter* and its progeny necessary to deny the motion to dismiss the loss of consortium claim.

At the time of this incident Patricia Wood lived at home, apparently contributing the benefits of her presence and companionship to the care and comfort of her parents. The notion that a parent's recovery is limited to the loss of a child's earning capacity is based upon master and servant principles not relevant to today's family relationships. *Shockley*, 225 N.W.2d at 497. Loss of companionship and society and the shared experiences of a family unit more accurately represent the loss caused by the tortious conduct of a third party. This loss ought not be instantly extinguished upon the reaching of the age of majority, especially where the unemancipated child continues to live at home with her family.

The Supreme Judicial Court stated in *Ferriter* that "[a]s claims for injuries to

---

**21.** It is instructive for a judge to be required to review one's own decision to see whether it has withstood the passage of time. At this remove, while the result may well be correct, I can see that my decision in *Prince-Jackson* unduly emphasizes the grief attendant upon the maiming or death of a child. A loss of consortium claim, however, does not compensate one for grief stemming from injury to a loved one but rather for damage to a beneficial relationship which, but for the intervention of the tortfeasor, would have continued undamaged. *See generally* Lowe, *Tortious Interference with the Parent-Child Relationship: Loss of an Injured Person's Society and Companionship*, 51 Ind.L.J. 590 (1976).

other relationships come before us, we shall judge them according to their nature and their force." 381 Mass. at 516 (footnote omitted). This counsels the development of a full record so that the "nature and ... force" of this particular relationship may be properly evaluated. It will be time enough, therefore, to certify this issue to the Supreme Judicial Court for determination, Rule 1:03 of the Rules of the Supreme Judicial Court, should Francis and Elizabeth Wood recover a jury verdict on their loss of consortium claim.

For the reasons stated above, therefore, both General Motors' motion to dismiss and its motion for summary judgment are DENIED.

SO ORDERED.