JOHN P. BACK, administrator, *vs.* THE WICKES CORPORATION & another[1]
(and four companion cases[2]).

Middlesex. March 8, 1978. — July 6, 1978.

Present: HENNESSEY, C.J., KAPLAN, WILKINS, LIACOS, & ABRAMS, JJ.

*Practice Civil*, Charge to jury, Argument by counsel. *Sale*, Warranty. *Uniform Commercial Code*, Warranty. *Evidence*, Business custom. *Negligence*, Manufacturer, Motor vehicle.

At the trial of products liability actions, arising out of an accident involving a motor home, the judge erred in instructing the jury that misuse

---

[1] Chrysler Corporation.

[2] Margaret E. King, administratrix, *vs.* The Wickes Corporation & another; Ruth Yeslow, administratrix, *vs.* The Wickes Corporation & another; Renzo Franceschi, administrator, *vs.* The Wickes Corporation & another; Albert L. Mead *vs.* The Wickes Corporation & another.

or abuse of the product would be a complete defense where there was no evidence that the accident had resulted from an unforeseeable misuse of the motor home. [638-641]

At the trial of products liability actions, arising out of an accident involving a motor home which caught fire after hitting a cable fence at the side of a highway, the judge did not err in refusing to instruct that the jurors were not to consider industry custom and practice to determine if the motor home was of merchantable quality. [641-643]

In negligence actions, arising out of an accident involving a motor home, against the manufacturers of the motor home and its chassis, the judge correctly charged the jury that the defendants were held to the standard of the ordinary, reasonably prudent manufacturer in like circumstances and there was no error in his refusal to instruct that "[a] manufacturer who undertakes to manufacture and market a product for use by consumers is held by the law to an expert's knowledge of the arts, materials and processes relating to his product". [643]

At a civil trial, the judge did not err in refusing to allow the plaintiffs' counsel to comment in closing argument on the defendant's failure to call an expert witness who had been present throughout the trial and to argue the inference that the expert's testimony would have been unfavorable to the defendants. [643-644]

FIVE CIVIL ACTIONS commenced in the Superior Court on September 13, 1974, September 16, 1974, November 12, 1974, July 15, 1975, and June 6, 1976, respectively.

The cases were tried before *Ronan*, J.

The Supreme Judicial Court granted a request for direct appellate review.

*Albert P. Zabin* for the plaintiffs.

*Philander S. Ratzkoff (Cynthia J. Cohen* with him) for The Wickes Corporation.

*Karl L. Gollub* for Chrysler Corporation.

HENNESSEY, C.J. These are five consolidated actions, four for wrongful death and conscious suffering, and one for personal injuries, arising out of an accident on the Massachusetts Turnpike. The plaintiffs' four decedents perished when the motor home in which they were riding caught fire and exploded after hitting a cable fence at the side of the highway. There was agreement among the parties' experts that the collision might have occurred at a speed as low as twenty-five miles an hour. The plaintiff Albert L. Mead, a

passing truck driver, tried to rescue the four from the burning vehicle, and he was injured in the attempt.

The motor home had been manufactured by The Wickes Corporation (Wickes) on a chassis manufactured by Chrysler Corporation (Chrysler). At the trial, the plaintiffs endeavored to prove by expert testimony that the motor home was negligently designed and unmerchantable. The plaintiffs alleged that certain conscious design choices by the defendants were responsible for making an otherwise minor collision fatal. The jury returned verdicts for the defendants in each case on both the negligence and the warranty counts. The plaintiffs appealed, and this court allowed direct appellate review.

We hold that it was error for the trial judge to instruct the jury on the issue of misuse. Accordingly, we reverse the judgments and remand the cases for a new trial on the warranty claims. Contrary to the plaintiffs' assertions, we find no error in the charge with respect to the negligence claims, as will be seen *infra*. We discuss the remaining assignments of error only in so far as they may arise at a new trial.

1. *The facts.* On June 8, 1974, about midnight, Gerald Back, Laura Franceschi, Warren King, and Laurie Yeslow, all students at the University of Massachusetts, were traveling west on the Massachusetts Turnpike in a twenty-three-foot motor home borrowed by Back from a friend of his brother. The vehicle was traveling at an estimated fifty miles an hour when it passed a truck driven by the plaintiff Mead. The motor home left Mead's sight as it rounded a curve, veered off the road into a reflector post and cable fence, and tipped over on its side.

Mead testified that as he rounded the curve he saw the motor home overturned at the side of the road and that "all at once the whole vehicle burst into flames from one end to the other." Mead stopped his truck, as did Wendall W. Betts, another truck driver, and the two attempted to free the screaming occupants by breaking the windshield. Their efforts ceased when an explosion shattered the windshield,

killing the occupants and throwing Mead some distance from the vehicle.

The record contains no explanation as to why the motor home struck the fence. Mead did not observe anything unusual about the motor home when it passed his truck. Betts had seen the motor home sway as it changed lanes, and he thought the vehicle had a flat tire. The plaintiffs' theory is that a tire blew out, but the accident reconstruction experts who testified at trial could not venture an opinion on this one way or the other.

The fence consisted of short metal posts connected by heavy wire cables. The experts agreed that one of the posts dislodged the motor home's gasoline tank — located near the right rear wheel — and caused it to become impaled on the vehicle's rear spring hanger. The experts did not agree, however, on how the tank became dislodged. The plaintiffs maintained that the motor home simply sideswiped the fence and that the posts tore away the side of the vehicle, including the tank, which the plaintiffs contend was not properly shielded from collision damage.

The defendants' reconstruction of the accident was somewhat different. Their evidence tended to show that the vehicle's right front wheel mounted the fence, that the motor home became virtually airborne, and that the impact to the gasoline tank came from beneath when the vehicle came down hard on the fence. The defendants submit that it is highly unusual for such a motor home to sustain a serious blow in its right rear quarter, especially from beneath.

2. *The alleged design deficiencies.* At trial, the plaintiffs maintained that the design of the motor home was dangerous in many respects. The defendants, in turn, denied that the motor home was defectively designed, and they relied heavily on evidence that the vehicle conformed to all product safety standards prevailing in the industry in 1973, when it was manufactured. We briefly review the conflicting evidence.

It was the opinion of the plaintiffs' expert Burnstine that the location of the fuel tank was not in conformance with

good engineering practice. The forty-gallon tank was mounted on the chassis, but outside the perimeter of the chassis frame. Thus situated, the tank did not receive the protection of the chassis frame during the collision. Burnstine testified that, given the state of the art in 1973, it would have been possible to design the chassis in such a way as to include the forty-gallon fuel tank within the frame. Chrysler's engineer testified, however, that mounting the tank inside the frame was not feasible for this model motor home. He also testified that all manufacturers in the industry place the fuel tanks outside the chassis frame on vehicles with an equivalent wheelbase; that the tank was mounted in the safest possible location; that it was located where the Federal government insists fuel tanks be placed on school buses; and that Chrysler, who had supplied the fuel tank, specifically recommended that Wickes not change the location.

The plaintiffs further contended that many other aspects of the vehicle's design contributed to making the side-mounted tank unnecessarily vulnerable to collision damage. Because of its shape, the tank protruded about eighteen inches outboard of the chassis frame, although it was still inside the outermost skin of the vehicle. The evidence tended to show that cost, rather than safety considerations, had determined the shape of the tank and that, if this tank had protruded less, it would have been less likely to rupture in a collision. The plaintiffs also stressed, among other things, the lack of protection afforded the fuel tank by the plywood floor and the aluminum siding; the failure of Wickes to treat the inflammable building materials with flame retardants; and the absence of structural members called body outriggers, which would have provided strength to the vehicle in a fore and aft direction, possibly preventing the dislocation of the fuel tank. The plaintiffs further stressed the lack of crash testing to determine the actual integrity of the fuel system.

The defendants' experts testified that the alternative designs suggested by the plaintiffs were all either less safe or structurally less sound. An inflammability expert testified

that he tested all the interior materials of an identical vehicle and that they met or exceeded the voluntary standards of the National Fire Protection Association and also the minimum standards prescribed for all vehicles by the United States Department of Transportation. As to each defect alleged by the plaintiffs, the defendants introduced evidence tending to show that the motor home's features were safe and proper and that Wickes and Chrysler had adhered to the highest industry practice.

3. *The instruction on misuse*. In his instructions on the warranty count, the judge charged the jury, over objection, that the misuse or abuse of the product would be a complete defense. He told the jury that if a product were used in an "extraordinary or unusual manner" there would be no warranty liability for any injury resulting from such "unusual or abusive or different use."[3] The correctness of this charge is determined not in the abstract, but by reference to the state of the evidence in the case. *Nelson* v. *Economy Grocery Stores Corp.*, 305 Mass. 383 (1940). In light of the evidence, this portion of the charge was erroneous.

There was no evidence whatsoever that the motor home had been misused; thus the instruction on misuse was superfluous and misleading. *Commonwealth* v. *Scagliotti*, 373 Mass. 626, 629 (1977). It should have been omitted. *Caron* v. *Lynn Sand & Stone Co.*, 270 Mass. 340, 348 (1930).

This portion of the charge also was incomplete in its statement of the law concerning misuse. Even if the evidence had warranted a charge on this issue, the charge given was misleading in that it allowed the jury to conclude that

---

[3] The judge charged as follows: "The misuse, the abuse of a product is, of course, a defense. The implied warranty of merchantability is that the product is reasonably suited for its ordinary use. If this product is used in extraordinary or unusual manner, then, of course, there is no breach of warranty for any injury resulting from an unusual or abusive or different use. I'll give you a perfect example; A motor home may be meant to travel between one place and another, and we all know that, but we all know that you couldn't put one in the Atlantic Ocean and go to London in it. So it's only the . . . implied warranty of merchantability which means that the thing is reasonably suited for its ordinary purposes."

crashing into a highway guardrail is an "abnormal" or "extraordinary" use of a motor home such as would absolve the manufacturer from liability. We have rejected this view in so far as it pertains to negligence actions, *Smith* v. *Ariens Co.*, *ante* 620, 624 (1978), and we likewise reject it with regard to products liability actions brought under the Uniform Commercial Code. It is no more than a play on words to charge that goods must be fit for "ordinary" purposes, but not for "extraordinary" or "different" or "unusual" purposes. Such an instruction fails to inform the jury as to whether the defendant has warranted the goods to be free from the propensity that caused the plaintiff's injuries.

Amendments to the Massachusetts version of the Uniform Commercial Code make clear that the Legislature has transformed warranty liability into a remedy intended to be fully as comprehensive as the strict liability theory of recovery that has been adopted by a great many other jurisdictions. See *Swartz* v. *General Motors Corp.*, *ante* 628, 630 (1978); *Hoffman* v. *Howmedica, Inc.*, 373 Mass. 32, 34-37 (1977). By enacting St. 1971, c. 670, § 1, amending G. L. c. 106, § 2-318, the Legislature abolished the requirement of privity which previously had been deemed essential to recovery. *Nectas* v. *General Motors Corp.*, 357 Mass. 546, 549 (1970).[4] The Legislature has sanctioned the judicial extension of warranty liability, in a proper case, to nonsales transactions such as commercial leases. St. 1973, c. 750, further amending G. L. c. 106, § 2-318. See *Cintrone* v. *Hertz Truck Leasing & Rental Serv.*, 45 N.J. 434 (1965). Suppliers of goods may not exclude or limit the operation of § 2-318 by contract, nor may merchants disclaim the implied warranty of merchantability. See G. L. c. 106, § 2-318, most recently amended by St. 1974, c. 153; *id.* § 2-316A, as amended by St. 1973, c. 799, § 1. All these features

---

[4] Equally fatal to the warranty claim in *Nectas* was the fact that the wrongful death statute in that case did not allow recovery for breach of warranty. *Nectas* v. *General Motors Corp.*, 357 Mass. 546, 549-550. The statute has since been amended to eliminate this obstacle. G. L. c. 229, § 2, as most recently amended by St. 1973, c. 957, § 1.

indicate clearly that the duty which the plaintiff sues to enforce in a "warranty" action for personal injuries is one imposed by law as a matter of social policy, and not necessarily one which the defendant has acquired by contract. See generally *Henningsen* v. *Bloomfield Motors, Inc.*, 32 N.J. 358 (1960); *Jacob E. Decker & Sons* v. *Capps*, 139 Tex. 609 (1942). The Legislature has jettisoned many of the doctrinal encumbrances of the law of sales, and what remains is a very different theory of recovery from that traditionally associated with the sale of goods. The Legislature has made the Massachusetts law of warranty congruent in nearly all respects with the principles expressed in Restatement (Second) of Torts § 402A (1965). For this reason, we find the strict liability cases of other jurisdictions to be a useful supplement to our own warranty case law. See *Heavner* v. *Uniroyal, Inc.*, 63 N.J. 130, 146-162 (1973); *Codling* v. *Paglia*, 32 N.Y.2d 330, 341-345 (1973); *Dawson* v. *Canteen Corp.*, W. Va.     , (1975).[a]

The merchant seller warrants that his goods are, among other things, "fit for the ordinary purposes for which such goods are used." G. L. c. 106, § 2-314 (2) (c), inserted by St. 1957, c. 765, § 1. The "ordinary purposes" contemplated by this section include both those uses which the manufacturer intended and those which are reasonably foreseeable. See, e.g., *Grant* v. *National Acme Co.*, 351 F. Supp. 972, 978 (W.D. Mich. 1972). Cf. *Smith* v. *Ariens Co.*, *supra* at 623-624. Clearly, a defendant is not liable for the consequences of the unforeseeable misuse of a product. See, e.g., *Colosimo* v. *May Dep't Store Co.*, 466 F.2d 1234 (3d Cir. 1972); *Olson* v. *Babbitt*, 291 Minn. 105 (1971). Warranty liability is not absolute liability, and the manufacturer of a motor vehicle is not obliged to make its product collision-proof. See, e.g., *Willis* v. *Chrysler Corp.*, 264 F. Supp. 1010 (S.D. Tex. 1967) (head-on collision at high speed). Nor is the motor vehicle manufacturer obliged to design against bizarre, unforeseeable accidents. *Mieher* v. *Brown*, 54 Ill. 2d 539, 545 (1973). But a manufacturer must anticipate the

---

[a] 212 S.E.2d 82, 84 (1975).

environment in which its product will be used, and it must design against the reasonably foreseeable risks attending the product's use in that setting. See *doCanto* v. *Ametek, Inc.*, 367 Mass. 776, 782-783 (1975); *Bolm* v. *Triumph Corp.*, 33 N.Y.2d 151 (1973); *Mickle* v. *Blackmon*, 252 S.C. 202 (1969). See also *Turcotte* v. *Ford Motor Co.*, 494 F.2d 173, 180, 187 (1st Cir. 1974); *Ritter* v. *Narragansett Elec. Co.*, 109 R.I. 176, 184-185 (1971).

The risk that a motor home may collide with a highway guardrail clearly is foreseeable, see *Smith* v. *Ariens Co.*, *supra*, and the instruction as to misuse should have been omitted because there was no evidence suggesting that the accident had resulted from an unforeseeable misuse of the motor home.

4. *Standards of the trade.* In charging the jury on negligence, the judge stated: "Evidence as to whether or not a person conformed to a business custom that has grown up in a given industry or location is relevant, and it ought to be considered, but it is not necessarily controlling on the question of whether or not the defendant exercised ordinary care." Later, in his discussion of the warranty count, the judge gave no further instruction as to the significance of conformity with industry practice. The plaintiffs argue that the judge erred in refusing to instruct that the jurors were not to consider industry custom and practice to determine if the motor home was of merchantable quality. There was no error.

The question for the jury was whether this motor home was, at a minimum, "fit for the ordinary purposes for which such goods are used." G. L. c. 106, § 2-314 (2) (*c*). If this were a case involving a manufacturing defect, the jury might simply compare the propensities of the product as sold with those which the product's designer intended it to have and thereby reach a judgment as to whether the deviation from the design rendered the product unreasonably dangerous and therefore unfit for its ordinary purposes. This case presents a more difficult jury question, however.

The evidence in this case warranted a finding that the motor home had a built-in propensity to catch fire and explode under certain crash conditions. One question for the jury was whether these circumstances were reasonably foreseeable. See G. L. c. 106, § 2-715 (2) (b). A separate question, however, was whether this propensity, resulting from conscious design choices of the manufacturer, rendered the product unreasonably dangerous to its users and therefore unfit for highway travel. See, e.g., *Dreisonstok* v. *Volkswagenwerk, A.G.*, 489 F.2d 1066, 1070-1071 (4th Cir. 1974). The "fitness" of this motor home and all others of the same design is a question of degree, depending largely, although not exclusively, on reasonable consumer expectations. See *Bruce* v. *Martin-Marietta Corp.* 544 F.2d 442, 447 (10th Cir. 1976); *Barker* v. *Lull Eng'r Co.*, 20 Cal. 3d 413 429-430 (1978).

In deciding this issue, the jury must weigh competing factors much as they would in determining the fault of the defendant in a negligence case. The inquiry focuses on product characteristics rather than on the defendant's conduct, but the nature of the decision is essentially the same. See *Dreisonstok* v. *Volkswagenwerk, A.G.*, *supra* at 1068 n.2; *Phillips* v. *Kimwood Mach. Co.*, 269 Ore. 485, 492 (1974); W. Prosser, Torts § 99 at 659 n.72 (4th ed. 1971). In evaluating the adequacy of a product's design, the jury should consider, among other factors, "the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design." *Barker* v. *Lull Eng'r Co.*, *supra* at 431. See *Bowman* v. *General Motors Corp.*, 427 F. Supp. 234, 242 (E.D. Pa. 1977).

In balancing all the pertinent factors, the jury made a judgment as to the social acceptability of the design, and this is the same judgment originally made by the designer of the product. Evidence that all product designers in the in-

dustry balance the competing factors in a particular way clearly is relevant to the issue before the jury. Conformity to standard practice is not dispositive, of course, and counsel may argue that industry standards can and should be more stringent. But the judge correctly refused to instruct the jury that evidence of conformity to industry practice was immaterial to their decision on the warranty count.

5. *Standard of care.* There was no error in the judge's charge concerning the negligence count. The plaintiffs requested the judge to instruct that "[a] manufacturer who undertakes to manufacture and market a product for use by consumers is held by the law to an expert's knowledge of the arts, materials and processes relating to his product." The judge declined to give the instruction "as requested," and he charged, in essence, that the defendants were held to the standard of the ordinary, reasonably prudent manufacturer in like circumstances. This was a correct statement of the law. See *Schaeffer* v. *General Motors Corp.*, 372 Mass. 171, 174 (1977); *Ricciutti* v. *Sylvania Elec. Prods., Inc.*, 343 Mass. 347, 352 (1951); *Thornhill* v. *Carpenter-Morton Co.*, 220 Mass. 593, 597 (1915). The shortcoming of the requested instruction is that it would have directed the jury to require of the defendants the knowledge and skill of some unspecified "expert" rather than simply the knowledge and skill of a reasonable person in the same circumstances (including, of course the circumstance of being a manufacturer of motor homes). Cf. *Brune* v. *Belinkoff*, 354 Mass. 102, 109 (1968).

6. *Closing argument.* The plaintiffs assert that an independent engineer, designated by Chrysler as an expert witness in the case, was present in the court room throughout most of the trial; that this expert was one of the authors of an article on automotive crash fires; that the article would have rendered him highly vulnerable on cross-examination if he had testified; and that defense counsel for Chrysler sent the expert from the court room on the last day of the trial, shortly before Chrysler rested its case. None of these facts is in evidence. At a lobby conference, plaintiffs' counsel an-

nounced that he intended to comment in closing argument on Chrysler's failure to call this witness and to argue the inference that the expert's testimony would have been unfavorable to Chrysler.

There was no error in the judge's ruling which prohibited the plaintiffs' lawyer from so arguing. A judge has discretion to allow such an argument when it is based on facts in evidence. E.g., *McKim* v. *Foley*, 170 Mass. 426, 428 (1898). But it is fundamental that counsel may not state in argument facts which are not part of the evidence or the fair inferences from the evidence. *Leone* v. *Doran*, 363 Mass. 1, 18 (1973). There was no evidence in this case even of the expert's existence.

7. *Conclusion.* The only error in the cases relates to the warranty claims. The judgments are therefore reversed as to the warranty claims, and the cases are remanded to the Superior Court for a new trial on those claims only.

*So ordered.*