McHugh, J.
L Background A. General
From facts in the record the jury could accept as true, it appears that in October of 1984, plaintiff, James M. Stewart, bought three parakeets at an F.W. Woolworth Company (“Woolworth”) store. The parakeets were supplied to Woolworth by defendant Harte Mountain Corporation (“Harte"). After Mr. Stewart took the parakeets home, it appeared to him that one of the three was sick. The sick bird appeared to be sneezing or coughing, had runny drops of liquid coming out of its beak, stayed near the water in the cage and would not let the other two near the food or the water.
A day or two later, the sick bird escaped from the cage. Mr. Stewart attempted to recapture the bird using a technique described in a booklet Woolworth had given him when he bought the birds. In the process, the bird bit Mr. Stewart on the hand, drawing blood. Stewart immediately sucked the blood on his hand, apparently in an effort to cleanse the wound.
The day after the biting incident, the sick bird died. Mr. Stewart returned the bird’s body to Woolworth and received a replacement bird. The bird’s body was disposed of and no tests ever were performed on it to determine what had caused its death or antecedent sickness.
Shortly after the biting incident, Mr. Stewart began suffering from a variety of physical symptoms, including severe stomach pains, chest pain, high fevers with headaches, nausea and vomiting, and significant weight loss.[1] After an extended period of hospitalization and tests, Mr. Stewart’s condition was diagnosed as granulomatous hepatitis.[2] For that condition, physicians prescribed Prednisone, a steroid, which successfully controlled his fevers and other symptoms but had substantial side effects, the worst of which involved, and continues to produce, a slow deterioration of Mr. Stewart’s joints. That deterioration necessitated hip and shoulder replacements, surgeiy for hip core decompression and anticipated surgeries in the future. Mr. Stewart’s medical bills to date are in excess of $75,000.00.
Mr. Stewart claims that his medical condition was caused by the bite he received from the sick bird. He filed a complaint in this action alleging that Woolworth and Harte were negligent and broke warranties they made when they sold the bird. Mr. Stewart’s wife joined as a plaintiff seeking to recover for lost consortium. Defendants have filed a motion for summary judgment claiming that Mr. Stewart cannot prove a causal connection between the bird bite and his illness and that, in any event, they were not negligent and broke no warranties when they sold the bird.
B. Expert Opinion
Mr. Stewart’s ability to prove causation turns on the anticipated testimony of his expert witnesses. The first, Marjorie C. McMillan, D.V.M., is a veterinarian *15 specializing in avian medicine. Her testimony, in substance, is to the effect that the sick parakeet was suffering from a respiratory infection secondary to an underlying infection and that those infections ultimately caused the parakeet’s death. Dr. McMillan has not been able to identify the specific infectious agent that caused either the parakeet’s respiratory problem or its underlying disease, although she was of the opinion that the symptoms “were probably caused by any one of a number of microorganisms such as a virus, bacteria, microbacteria, fungus, or chlamydia.” Defendants have challenged neither Dr. McMillan’s qualifications nor her conclusions.
Mr. Stewart’s second expert is his treating physician, Cyrus C. Hopkins, M.D., a physician at the Massachusetts General Hospital where he is clinical director of the Infectious Disease Unit, epidemiologist for the hospital and director of the hospital’s infection control program. Transcript of the Deposition of Cyrus C. Hopkins, M.D. (“Hopkins Dep.") at 5-6. Dr. Hopkins has had clinical experience with ten to twenty cases of granulomatous hepatitis, a somewhat rare disease, other than Mr. Stewart’s. Hopkins Dep. at 7.
Mr. Stewart first came under Dr. Hopkins’s care in December of 1988 and currently remains under that care. Hopkins Dep. at 9. By the time he contacted Dr. Hopkins for the first time, Mr. Stewart had been in treatment for his problems for approximately three years. Hopkins Dep. at 9, 109-10. During the course of his treatment, Dr. Hopkins obtained a history from Mr. Stewart, reviewed all of Mr. Stewart’s available medical records, administered treatment to him, observed his progress under the treatment, continues to treat him today and continues to observe the effects of that treatment. Based on all of the knowledge specific to Mr. Stewart he obtained and based on his background and training, Dr. Hopkins testified at his deposition and is prepared to testify at trial that it is “far more likely than not" that Mr. Stewart contracted granulomatous hepatitis when he was bitten by the sick parakeet. Hopkins Dep. at 32-33, 49-50.
When asked if he could identify the organism that actually was transmitted by the sick parakeet to Mr. Stewart, however, Dr. Hopkins responded that he could not. Hopkins dep. at 33. He also stated that he had not done any tests designed specifically to identify the organism. Hopkins dep at 34. When asked for the basis of his opinion that the parakeet in fact transmitted the organism that caused Mr. Stewart’s illness, Dr. Hopkins responded as follows:
that granulomatous hepatitis is an infrequent or very rare disease: that a number of — significant proportion of the cases of granulomatous hepatitis, including [Mr. Stewart’s], have no known or demonstrated cause: and that the proximity of his description of his exposure to a bird, which seemed to both appear and be acting ill by his sense, not mine, since I’m not a veterinarian, seems too close in time to be coincidental. . . [a]nd that the likely association in time would not result in a transfer or a toxic agent, but would be more likely to result in transfer of an infectious agent.
Hopkins Dep. at 51. See also id. at 53-54.
It is also apparent that, during the course of his treatment of Mr. Stewart and before forming his opinion, Dr. Hopkins performed a series of tests designed to rule out all of the known causes of the disease including cytomegalovirus, Hopkins Dep. at 37, primary biliary cirrhosis, Hopkins Dep. at 55, sarcoido-sis, Hopkins Dep. at 56, lymphoma, Hopkins Dep. at 59, salmonella, Hopkins Dep. at 89 and fungal diseases, Hopkins Dep. at 92. Based on his general knowledge and background, he also ruled out viral hepatitis, Hopkins Dep. at 69, alcohol abuse, Hopkins Dep. at 72 and ingestion of Tylenol, Hopkins Dep. at 73, as possible causes.
Finally, but consistent with his testimony that a “significant proportion of the cases of granulomatous hepatitis, including [Mr. Stewart’s], have no known or demonstrated cause,” Dr. Hopkins testified that his working diagnosis of Mr. Stewart’s illness was idiopathic granulomatous hepatitis, i.e., granulomatous hepatitis without a known cause. Hopkins Dep at. 42.
II. Standard for Summary Judgment
Until recently, the principles governing summary judgment in Massachusetts were those the Supreme Judicial Court had articulated in Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). Under those principles,
[t]he party moving for summary judgment assumes the burden of affirmatively demonstrating that there is no genuine issue of material fact on every relevant issue, even if he [or she] would have no burden on an issue if the case were to go to trial... If the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact in order to defeat a motion for summary judgment. (Footnote omitted.)
In the case of Kourouvacilis v. General Motors Corp., 410 Mass. 706 (1991), however, the Court embraced the principles set forth by the Supreme Court of the United States in Celotex Corp. v. Catrett, 477 U.S. 317 (1986). Under those principles,
a party who moves for summary judgment has the burden of initially showing that there is an absence of evidence to support the case of the nonmoving party shouldering the burden of proof at trial.![3]] That burden is not sustained by the mere filing of the summary judgment motion or by the filing of a motion together with a statement that the other party has produced no evidence that would prove a particular necessary element of this case. The motion must be supported by one or more of the materials listed in rule 56(c) and, although that *16 supporting material need not negate, that is, disprove, an essential element of the claim of the party on whom the burden of proof at trial will rest, it must demonstrate that proof of that element at trial is unlikely to be forthcoming.
Kourouvacilis, supra, 410 Mass. at 714. As a consequence, there are now two ways in which the party moving for summaiy judgment may meet the burden imposed by Mass.R.Civ.P. 56. The first of those follows traditional Massachusetts law:
[T]he moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim.
Kourouvacilis, supra, 410 Mass, at 715 quoting Celotex Corp. v. Catrett, supra, 477 U.S. at 331-32 (Brennan, J., dissenting). Second, however,
the moving party may demonstrate to the court that the nonmoving party’s evidence is insufficient to establish an essential element of the nonmoving party’s claim ... If the nonmoving party cannot muster sufficient evidence to make out its claim, a trial would be useless and the moving party is entitled to summary judgment as a matter of law ... Plainly, a conclusoiy assertion that the nonmoving party has no evidence is insufficient. . . Such a “burden" of production is no burden at all and would simply permit summary judgment procedure to be converted into a tool for harassment. . . Rather, ... a party who moves for summaiy judgment on the ground that the nonmoving party has no evidence must affirmatively show the absence of evidence in the record.
IcL Put another way,
a party moving for summaiy judgment in a case in which the opposing party will have the burden of proof at trial is entitled to summary judgment if he [or she] demonstrates, by reference to material described in Mass.R.Civ.P. 56(c), unmet by countervailing materials, that the party opposing the motion has no reasonable expectation of proving an essential element of that party’s case. To be successful, a moving party need not submit affirmative evidence to negate one or more elements of the other party’s claim.
Kourouvacilis, supra, 410 Mass. at 716.
In applying that standard,
[w]here a moving party properly asserts that there is no genuine issue of material fact, “the judge must ask himself [or herself] not whether he [or she] thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.” Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). A judge’s mere belief that the movant is more likely to prevail at trial is not a sufficient basis for granting summaiy judgment.
Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991).
Iil. Discussion
Against that background, defendants make two contentions in support of their motion for summaiy judgment. The first is that plaintiffs cannot prove their case without expert testimony as to causation and Dr. Hopkins’s testimony is based on pure speculation. Second is that even if Dr. Hopkins’s testimony is not impermissibly speculative, the incident was so unusual, so impossible to guard against, that sale of a bird capable of causing the disease was neither negligent nor a breach of warranty.[4]
A Breach of Warranty
Insofar as it concerns a breach of warranty, defendants’ motion is without merit. A breach of warranty in Massachusetts imposes on a manufacturer or seller strict liability for physical harm that results from a defect in a product. Correa v. Firestone Tire & Rubber Co., 388 Mass. 342, 353 (1983); Wolfe v. Ford Motor Co., 386 Mass. 95, 97-98 (1982); Back v. Wickes, 375 Mass. 633, 640 (1978). A defendant therefore may be held liable for a breach of warranty even though the defendant properly designed, manufactured or sold the product in question. Colter v. Barber-Green Co., 403 Mass. 50, 62-63 (1988); Rice v. James Hanrahan & Sons, 20 Mass.App.Ct. 701, 708 (1985). Imposition of liability without fault, at least in the traditional sense, follows from the fact that the relevant inquiry focuses on the product’s characteristics rather than on the defendant’s conduct. Back v. Wickes, supra, 375 Mass, at 642. Moreover,
[f]or purposes of our warranty law, adequacy of a warning is measured by the warning that would be given at the time of sale by an ordinary and prudent vendor who, at that time, is fully aware of the risks presented by the product: a defendant vendor is held to that standard regardless of the knowledge of risks that he actually had or reasonably should have had when the sale took place. The vendor is presumed to have been fully informed at the time of sale of all risks. The state of the art is irrelevant, as is the culpability of the defendant.
Hayes v. Ariens Co., 391 Mass. 407, 413 (1984).
As stated earlier, see n.5, supra, Mr. Stewart, in a concession fully warranted by the record, agrees that he cannot establish a claim for negligence. Given the legal environment, however, it is clear that, if the jury concludes that the parakeet was sick, that the parakeet transmitted a disease to Mr. Stewart, that the disease caused the problems from which Mr. Stewart currently suffers, the jury could also conclude that the parakeet was “defective” and that Hartz and Woolworth broke warranties they made when they sold it to him. In sum, there is *17 enough in the record to require denial of defendants’ motion insofar as that motion is based on a claim that there was no breach of warranty.
B. The Testimony of Dr. Hopkins
There is no doubt that Mr. Stewart bears the burden of showing a causal link between the alleged defect in the bird and the disease from which he currently suffers. Cannon v. Sears Roebuck & Co., 374 Mass. 739, 742 (1978). Where, as here, the alleged nexus between the bird and the injury is not within the unaided power of a layperson to determine, expert testimony is required. Sevigney’s Case, 337 Mass. 747, 749 (1958). Thus, without Dr. Hopkins’ testimony, Mr. Stewart cannot succeed.
For analytical purposes, defendants’ contentions with respect to Dr. Hopkins’s testimony can be broken into two parts. First is that the opinions Dr. Hopkins ventured are couched in impermissibly speculative language. The second is that, even if expressed with requisite certainty, Dr. Hopkins’s opinions are imper-missibly speculative as a matter of substance.
Defendant’s first contention is unpersuasive. Unlike, for example, Goffredo v. Mercedes Benz Truck Co., 402 Mass. 97, 102-03 (1988), where the court rejected the expert’s opinion in part because the opinion was expressed in “possibilities” rather than “probabilities," Dr. Hopkins’s opinions, when read as a whole, are stated with the degree of certainty the law requires. See generally Berardi v. Menicks, 340 Mass. 396, 401-02 (1960).
Defendants’ contentions with respect to the speculative basis of Dr. Hopkins’s opinion are more serious. As stated earlier. Dr. Hopkins based his opinion about causation on the temporal connection between the bite and the onset of the symptoms and the work he had done to eliminate other possible causes of the disease.[5] When all was said and done, however, Dr. Hopkins was not able to describe the organism that caused the disease and agreed that, in a significant number of cases, the disease derives from unknown causes. In choosing between a “known” and an “unknown” cause, then, Dr. Hopkins was relying not on an empirically tested theoiy or on a fully developed postulate. Instead, he was relying on an intuitive judgment informed by his knowledge of facts particular to Mr. Stewart and his abundant and undoubted general knowledge, background and experience.
Expert testimony has been permitted when the basis for the expert’s opinion is circumstantial even if the expert was not able to articulate precisely how the phenomenon in question had occurred. In Breidor v. Sears Roebuck & Co., 722 F.2d 1134, 1138-39 (3rd Cir. 1983), for example, a fire expert testified that he had examined all possible causes of a fire in a refrigerator and had ruled out all but the one implicating defendant. While acknowledging that the implicating theory was based on the existence ofadefective component, the expertalso testified that he was unable to discover any such defect in the refrigerator because of fire damage and because some components had been installed in inaccessible locations.
The trial court excluded the opinion because the expert was unable to testify affirmatively and his theoiy was not supported by his direct observations or empirical studies. On appeal, the Court of Appeals held that exclusion was error, saying that when an expert “identifies the cause of fire in terms of probabilities (as opposed to mere possibilities) by eliminating all but one reasonable potential cause, such testimony is highly probative." Id. at 1138 (emphasis added).
Here, Dr. Hopkins has not gone quite that far. He has, instead, effectively ruled out all known causes leaving a choice between an unknown cause and the cause he embraced. An unknown cause, of course, is almost always a possible cause when the expert’s opinion is based, as it may be, on probabilities instead of mathematical certainties. The question in this case therefore, is whether Dr. Hopkins should be permitted to select between known and unknown and opine as to the “known” based on the factors he described and his general background, knowledge and experience.
In my view, the answer to that question is yes. In a world, and in an era, when frontiers of scientific knowledge are constantly expanding and when knowledge itself is comprised of increasingly complex elements, experts play a vital and central role in explaining the occurrence of complex phenomena. Therefore, as the United States Court of Appeals for the District of Columbia Circuit put it in another context some years ago,
[¡Judges, both trial and appellate, have no special competence to resolve the complex and refractoiy causal issues raised by the attempt to link low-level exposure to toxic chemicals with human disease. On questions such as these, which stand at the frontier of current medical and epidemiological in-quiiy, if experts are willing to testify that such a link exists, it is for the jury to decide whether to credit such testimony.
Ferebee v. Chevron Chemical Co., 736 F.2d 1529, 1534 (D.C. Cir. 1984).[6]
Equally important were the court’s observations about the admissibility of expert testimony in areas where the expert was offering novel conclusions.
[A] cause-effect relationship need not be clearly established by animal or epidemiological studies before a doctor can testify that, in his opinion, such a relationship exists. As long as the basic methodology employed to reach such a conclusion is sound, such as the use of tissue samples, standard tests, and patient examination, prod *18 ucts liability law does not preclude recovery until a “statistically significant" number of people have been injured or until science has had the time and resources to complete sophisticated laboratory studies of the chemical. In a courtroom, the test for allowing a plaintiff to recover in a tort suit of this type is not scientific certainty but legal certainty; if reasonable jurors could conclude from the expert testimony that paraquat more likely than not caused [plaintiffs] injury, the fact that another jury might reach the opposite conclusion or that science would require more evidence before conclusively considering the causation question resolved is irrelevant. That [plaintiffs] case may have been the first of its exact type, or that his doctors may have been the first alert enough to recognize such a case, does not mean that the testimony of those doctors, who are concededly well qualified in their fields, should not have been admitted.
Id. at 1535-36. See also Ambrosini v. Labarraque, 966 F.2d 1464, 1467-68 (D.C. Cir. 1992).
The point can be, and has been, made another way:
At a basic level, the legal system uses the idea of expertness to accomplish its objective of reaching a conclusion by subsuming the very question of whether a conclusion is possible within the domain of expertise. Thus, if a sufficiently credentialed expert says he has reached a conclusion to a reasonable degree of certainty, that is generally enough. The very question of whether it is possible to come to a conclusion to a reasonable degree of certainty is considered a matter the court is not sufficiently competent to judge.
. . . [T]he essence of the difference between a diagnostician and a statistician is that the diagnostician exercises intuitive judgment about the relation of many factors, whereas the statistician is limited by his methodology to considering but a few. The diagnostician will use detail specific to the individual as a basis for opinion: the statistician is bedeviled by such detail.
Nesson, Agent Orange Meets the Blue Bus: Fact Finding at the Frontier of Knowledge, 66 B.U.L. Rev. 521, 531, 534 (1986).
Here, Dr. Hopkins’s choice between known and unknown represents an opinion he formed after treating Mr. Stewart, after conducting studies to rule out other causes, after obtaining a history from Mr. Stewart, after observing Mr. Stewart and after performing other tests that are perfectly consistent with established medical methodology. Dr. Hopkins manifested a keen awareness of, and rejected, the fallacious notion that proximity in time always carries with it a causal link. See n.6, supra. While his opinion is unsupported by epidemiological evidence, it does rest on an articulated, if general, scientific understanding of the mechanics of causation. Cf. Lynch v. Merrell-Na-tional Labs, 646 F.Supp. 856, 863 (D.Mass. 1986) (Mazzone, J.), aff'd 830 F.2d 1190 (1st Cir. 1987). Under those circumstances Dr. Hopkins’s testimony is, in my view, admissible.
Ruschetti's Case, 299 Mass. 426, 430 (1938), Milch v. Boston Consolidated Gas Co., 341 Mass. 230, 233 (1960), Imbimbo v. Ahrens, 360 Mass. 847 (1971) (rescript), and Lynch v. Egbert, 360 Mass. 90, 92-93 (1971), all are relied upon by defendant and all rejected expert opinions as speculative. But “speculation” is the conclusoiy label one attaches to an opinion insufficiently grounded in admissible fact. As stated above, Dr. Hopkins chose between an unknown cause of Mr. Stewart’s ailment and the parakeet bite on the basis of his empirical observations and his medical judgment. His resulting opinion is not, in my view, so loosely connected to admitted fact and observable phenomenon that a juiy should be prohibited from hearing and, if it chooses, accepting, his expert judgment.
More to the point, in my view, is Marlow v. Dike, 269 Mass. 38, 40 (1929). There the court described the expert testimony, and its impact, as follows:
The doctor who attended the boy in the hospital at the time of the injury, having had stated to him in hypothetical questions a description of the condition of the boy during the last few hours of his life, testified that his explanation was that in the process of healing from the fracture and operation some clot “might have become organized causing an embolus or thrombus, and then got loose” thus causing death, and that this explanation in his opinion was “the probable cause” of death. This was positive testimony from one qualified to express an opinion. If the jury gave it credence, it was adequate to show that there was a causal connection between the negligent act of the defendant and the death of the boy. The plaintiff was not required to prove the precise organic changes which took place . . . Although the evidence was slender, it cannot be pronounced insufficient.
There is more here than there was there and, in my judgment, what is here is therefore enough.
ORDER
In light of the foregoing, it is hereby ordered that defendants’ motion for summary judgment should be, and it hereby is, ALLOWED as to all claims for negligence and that it should be, and hereby is otherwise DENIED.

 Defendants contend that these symptoms, in material part, antedated the biting incident. At this stage, however, the court must look at the facts and inferences in the record in the light most favorable to the plaintiffs, the non-moving parties. See Attorney General v. Bailey, 386 Mass. 371 (1982).

 Earlier, that condition had been diagnosed as psittacosis. That diagnosis was ultimately revised to granulomatous hepatitis.

 Kourouvacilis did not change the proposition that the moving partymust show the absence of any genuine issue of material fact before the non-moving party will be required to file any affdavit-based response of any kind. Smith v. Massimiano, 414 Mass. 81, 85-86 (1993).

 There is in the record evidence of the precautions that Hartz and Woolworth took to prevent sale of diseased birds. Plaintiff concedes that he cannot prove that anything Hartz could have done would have prevented sale of a bird with a potential to cause the problems from which he is suffering and thus that he cannot prove that Hartz was negligent

 Dr. Hopkins nonetheless rejected the notion that temporal proximity alone supported his conclusion about a causal link. Hopkins dep. at 54. See also Hupp v. United States, 563 F.Supp. 25, 30 (S.D. Ohio 1982).

 That kind of reliance on experts, of course, opens the door to the potential of abuse unfortunately too often manifested through presentation of “experts" who are willing to say anything for an appropriate fee. That problem is a complex one and requires complex solutions. It is not a problem here, for Dr. Hopkins undeniably is a highly qualified and highly respected physician whose judgments about matters like those now at issue help set policy, if indeed they do not dictate policy, at one of the world's finest medical treatment facilities.