GREGORY H. CARON *vs.* GENERAL MOTORS CORPORATION
& another.[1]

No. 92-P-420.

Franklin. March 24, 1993. - December 22, 1994.

Present: ARMSTRONG, BROWN, & PORADA, JJ.

*Practice, Civil,* Admissions, Objection, Deposition, Directed verdict. *Evidence,* Expert opinion. *Witness,* Expert, Unavailability. *Negligence,* Design, Manufacturer. *Uniform Commercial Code,* Warranty.

In a civil action, facts set forth in the plaintiff's requests for admissions should not have been deemed admitted where the defendants had filed timely motions to strike the requests as vague, overbroad and burdensome, which was sufficient written objection under Mass.R.Civ.P. 36 (a) to protect the defendants' rights, and where the plaintiff did not move to determine the sufficiency of the defendants' objection. [746-748]

At a civil trial the judge properly excluded the deposition of an out-of-State expert proffered by the plaintiff, where the judge could fairly conclude that the party proponent had not made a reasonable effort to secure the presence of the expert at the trial [749-751], and where, in any event, there was insufficient factual basis demonstrated in the deposition for the expert's opinion to be admitted [751-753].

Where a plaintiff in a products liability action did not demonstrate that his injuries resulted from a design defect in the automobile in question, the judge properly directed verdicts in favor of the defendants, the manufacturer and seller. [753-754] BROWN, J., concurring.

CIVIL ACTION commenced in the Superior Court Department on May 12, 1986.

The case was tried before *William H. Welch,* J.

*Louis Kerlinsky* for the plaintiff.

*Richard P. Campbell* for the defendants.

ARMSTRONG, J. The plaintiff, Gregory H. Caron, was injured when, intoxicated and navigating his 1975 Buick

---

[1]Lorenz Company.

LeSabre automobile at fifty to fifty-five miles per hour through dense fog by following the white line in the road,[2] he failed to negotiate a turn and drove the car down an embankment, striking a culvert, a small tree, a parked car, and ultimately a large tree after the car had rolled over. His two companions, neither seriously injured, were able to crawl out the rear windshield hole. Caron was trapped in the car, one leg caught between the driver's door and the car frame, the door apparently having opened at some point before jamming shut, either in the roll or on final impact with the large tree.

On May 12, 1986, Caron brought this action against the manufacturer of the car, General Motors (GM), and the vendor, Lorenz Company, alleging that his injuries resulted from, or were made more severe as a result of, a design defect in the 1975 LeSabre. Discovery in the case was protracted and divisive, including more than seventy-five discovery requests, eighteen motions to compel, and five motions for protective orders. Through discovery, it became apparent that the plaintiff would rely on three claims of defect: (1) that a defective door latch caused the driver's door to come open during his accident; (2) that insufficiently rigid materials in the car body caused it to crush excessively during the accident; and (3) that the Buick's interior was insufficiently padded to protect the occupants.[3] A scheduling order, entered in January, 1988, required that discovery be completed by March 31, 1988, with the case scheduled for trial in May.[4]

In order to show that a design defect caused or contributed to his injuries, Caron relied on evidence from two sources: requests for admissions which he had sent to the defendants, and which he claimed should be deemed admitted pursuant to Mass.R.Civ.P. 36(a), 365 Mass. 795 (1974); and the deposition testimony of John M. Noettl, an Arizona-based ex-

---

[2]The motion of the car, then upside down, was stopped by the impact with the large tree, the point of impact being the driver's door hinge pillar and "A" pillar (which runs up the left side of the front windshield. Those pillars were crushed inward to some extent.

[3]No evidence on the padding claim was offered by the plaintiff at trial.

[4]The case ultimately came to trial on November 14, 1988.

pert in automotive safety, who Caron claimed was unavailable to testify in person at trial. The trial judge excluded Noettl's deposition testimony, and granted the defendants relief from some but not all of the proffered admissions. At the close of the plaintiff's case, the judge directed verdicts for both defendants on the ground that Caron had not shown that his injuries were caused or worsened by a design defect.

Caron appealed and argues that the judge erred in granting relief from the admissions, in excluding the deposition of the plaintiff's auto safety expert, and in directing verdicts for the defendants. We hold that any error made by the judge was harmless, and that the verdicts were properly directed.

1. *Requests for admissions.* Among the many discovery disputes, there was contention regarding the literally hundreds of requests for admissions filed by the plaintiff in January and February, 1988, shortly before the discovery cutoff date. See Mass.R.Civ.P. 36, 365 Mass. 795 (1974). Rather than piecing through the requests to make the individual admissions, denials or objections envisioned by rule 36, GM and Lorenz moved to strike the requests, contending that they were vague, overbroadly worded, and unduly burdensome to the defendants. Argument on those motions and one by the plaintiff to compel production of documents was heard on March 17, 1988. The judge denied the plaintiff's motion to compel but never acted on the defendants' motions to strike the admissions requests. At trial, the plaintiff moved that the facts set forth in those requests be deemed admitted, pursuant to rule 36(a), and sought to read certain of the requests to the jury. The defendants argued in opposition that the time for answering the requests had been tolled by their motions for protective orders, and, in the alternative, they moved for permission to file late responses. A complete set of responses to the requests was filed along with the defendants' motions.

The trial judge, assuming that "the burden [had been] on the defendants to press their motion or get an extension of time within which to answer the requests," held that the facts asserted in Caron's requests were deemed admitted.

Nonetheless, the court granted relief from some of the deemed admissions, pursuant to rule 36(b), finding that many of the requests were "not truly requests for admission," and that the defendants should be permitted to amend the admissions, in order to advance the presentation of the merits. See *Reynolds Aluminum Bldg. Prod. Co.* v. *Leonard*, 395 Mass. 255, 260 (1985).

Because we hold that the facts set out in the requests should not have been deemed admitted, we need not pass on the propriety of the relief granted by the judge. Deemed admissions result only when the party from whom admissions are sought fails to serve upon the requesting party, within thirty days after service of the request, "either (1) a written statement signed by the party under the penalties of perjury specifically (i) denying the matter or (ii) setting forth in detail why the answering party cannot truthfully admit or deny the matter; or (2) a written objection addressed to the matter, signed by the party or his attorney." Mass.R.Civ.P. 36(a). The parties cite no Massachusetts authority on the question whether a motion for a protective order with respect to the request for admissions constitutes the "written objection" required by rule 36(a). The bulk of authority under the cognate Federal rule holds that a motion for a protective order which states reasons which can be considered grounds for objection[5] is sufficient to protect the objecting party's rights. See *J.R. Prewitt & Sons, Inc.* v. *Willimon*, 20 F.R.D. 149, 150 (W.D. Mo. 1957); *In re Milwaukee Crate & Lumber Co.*, 206 F. Supp. 115, 117 (E.D. Wis. 1961); 8 Wright & Miller, Federal Practice and Procedure: Civil § 2262 at 733, 735 (1970) ("there is so little practical difference between an objection and a motion for a protective order that it is probably not worth the effort to attempt to maintain a clear dis-

---

[5]The requests for admissions in this case were facially excessive, burdensome, and oppressive, such that a judge might properly have ordered them struck in their entirety. Requests for admissions should be thoughtfully structured to settle before trial issues as to which there may be no real contest. It is an abuse to deluge an opposing party with successive banks of requests for admissions hoping that he may inadvertently give away his case.

tinction between the two"). See also Smith & Zobel, Rules Practice § 36.7 (1975) (motion for protective order is alternative to specific objections).

Caron argues that the defendants waived their objection (if any) by failing to secure a determination on their motion to strike the requests. But rule 36 places the burden of moving to determine the sufficiency of an objection on the requesting party, not on the objecting party. See *ibid.* See also *United States* v. *Taylor*, 100 F. Supp. 1016, 1019 (W.D. La. 1951).[6] Since Caron failed to pursue a motion to determine the sufficiency of the defendants' objections, the facts asserted in his requests were never deemed admitted, and the answers filed by the defendants at trial were timely.[7]

2. *Expert testimony offered by deposition.* Caron's attorney offered in evidence the discovery deposition of his expert, John M. Noettl, who was deposed by the defendants on March 22, 1988, after the plaintiff had designated Noettl as his expert witness for the trial. The admissibility of depositions at trial is governed by rule 32, which provides, in part (a)(3)(B), that a deposition may be used in lieu of live testimony when the court, finds "that the witness is out of the Commonwealth, unless it appears that the absence of the witness was procured by the party offering the deposition." Mass.R.Civ.P. 32(a)(3)(B), as amended, 392 Mass. 1105 (1984). Caron, citing Noettl's deposition testimony to the ef-

---

[6] Prior to 1970, Federal rule 36 required that objections to requested admissions be delivered "together with a notice of hearing the objections at the earliest practicable time." 6 F.R.D. 229, 239 (1946). The rule was amended in 1970 to delete that requirement and add the provision allowing the requesting party to "move to determine the sufficiency of the answers or objections." 48 F.R.D. 459, 475 (1970). This change shifted the burden of going forward from the objecting party to the requesting party. See Fed.R.Civ.P. 36 Advisory Committee Notes; 4A Moore's Federal Practice par. 36.07 at 36-67 (1994). When the Massachusetts Rules of Civil Procedure were adopted in 1974, they followed the language of amended Federal rule 36. 365 Mass. 795 (1974).

[7] It is unnecessary to determine whether those facts that the defendants admitted in the set of responses filed at trial became conclusively established for purposes of this action.

fect that he resides in Arizona, argued that the judge was required by the rule to admit Noettl's deposition.

The judge gave two reasons for denying admission of the deposition: first, that he was not satisfied that Noettl was "out of the Commonwealth," by which we assume he may have meant (since it was not contested that Noettl lived in Arizona) that he was not satisfied that Caron's counsel had made an effort to arrange for Noettl's appearance at trial; and, second, that the deposition was inadmissible in any event because Noettl had lacked a sufficient basis for his conclusions.

(a) *Duty to arrange for expert's appearance at trial.* The cognate Federal rule to Mass.R.Civ.P. 32(a)(3)(B) is Fed.R.Civ.P. 32(a)(3)(B), which allows the admission of a witness's testimony by deposition if "the witness is at a greater distance than 100 miles from the place of trial or hearing, or is out of the United States, unless it appears that the absence of the witness was procured by the party offering the deposition." As to ordinary witnesses, whose testimony is admissible because they have personal knowledge of facts in the case, the Federal courts are relatively uniform in allowing depositions to substitute for the testimony of distant witnesses. "Procuring" a witness's absence means more than simply failing to secure his attendance at trial. "[P]rocuring absence and doing nothing to facilitate presence are quite different things . . ."; and the deposition will be admitted unless the party offering it "actively took steps to keep the deponents from setting foot in the courtroom." *Houser* v. *Snap-On Tools Corp.*, 202 F. Supp. 181, 189 (D. Md. 1962).

As to expert witnesses, however, the Federal authorities are split. Unlike fact witnesses, who are determined by their personal knowledge of relevant facts, regardless of where they live or work, a party normally has broad latitude in selecting his expert witnesses. By selecting an expert from Arizona, the plaintiff's counsel "procured" the absence of his expert from the Commonwealth in the sense that he voluntarily created a situation in which his expert would be out of the

Commonwealth unless he should make arrangements for the expert's appearance at trial. "[U]nlike the typical witness whose involvement with the case may depend on the fortuity of his observing a particular event and whose presence at the trial is often involuntary, a party ordinarily has the opportunity to choose the expert witness whose testimony he desires and invariably arranges for his presence privately, by mutual agreement, and for a fee. Although a requirement of an attempt to secure the voluntary attendance of a witness who lives beyond the subpoena power of the court is not ordinarily imposed before prior testimony can be used in civil litigation . . ., we think that such a requirement is particularly appropriate when dealing with the testimony of expert witnesses whose earlier attendance is almost invariably secured by such voluntary arrangements." *Carter-Wallace, Inc.* v. *Otte*, 474 F.2d 529, 536 (2d Cir. 1972), cert. denied, 412 U.S. 929 (1973). While there are many Federal decisions that do not differentiate between expert witnesses and fact witnesses in applying Fed.R.Civ.P. 32(a)(3)(B),[8] we are inclined to agree with those decisions that, given the latitude of choice in selecting experts and the general preference of the rules for testimony by live witnesses rather than depositions,[9] accord the judge discretion to exclude the deposition of an expert witness where the judge is not satisfied that the party proponent has made a reasonable effort to secure the expert's presence at the trial. See, e.g., *Hanson* v. *Parkside Surgery Center*, 872 F.2d 745, 750 (6th Cir. 1989); *Polys* v. *Trans-Colorado Airlines, Inc.*, 941 F.2d 1404, 1410 (10th Cir.

---

[8]See, e.g., *Savoie* v. *LaFourche Boat Rentals, Inc.*, 627 F.2d 722, 724 (5th Cir. 1980); *Alfonso* v. *Lund*, 783 F.2d 958, 961 (10th Cir. 1986) (distinguishable, however, on facts, because out-of-State expert witness was unavailable because he had suddenly been called out of the country); *Pfeiffer* v. *Eagle Mfg. Co.*, 137 F.R.D. 352, 354-355 (D. Kan. 1991). State court decisions contra include *State* v. *Lang*, 344 So. 2d 754, 757-759 (Ala. 1977); *Lee* v. *Volkswagen of America, Inc.*, 688 P.2d 1283, 1290 (Okl. 1984).

[9]See Mass.R.Civ.P. 32(a)(3)(E) and 43(a). See also *Napier* v. *Bossard*, 102 F.2d 467, 469 (2d Cir. 1939) ("the deposition has always been, and still is, treated as a substitute, a second-best. . . ."); Wright & Miller, 8 Fed. Practice & Procedure § 2142 & n.7 (1970).

1991); *In re Air Crash Disaster at Stapleton Intl. Airport,* 720 F.Supp. 1493, 1501-1502 (D. Colo. 1989);[10] *Myers* v. *Alessi,* 80 Md. App. 124, 138-139 (1989); *Thompson* v. *Merrill Dow Pharmaceuticals, Inc.,* 229 N.J. Super. 230, 252-253 (1988) ("We agree with the rationale of Judge Friendly in *Carter-Wallace* v. *Otte,* that expert witnesses are not unavailable simply because they are not subject to service of process. . . . [I]t is the responsibility of the party offering the expert to ascertain the willingness and availability of the expert to appear at trial. The proponent of the expert must attempt to arrange a trial date at which the expert can appear. Since the expert is under the control of the offering litigant, due diligence must be used to secure the attendance at trial").

Here, the trial judge doubtless suspected that Caron's counsel may have made little real effort to obtain Noettl's attendance at the trial. The explanation for his absence consisted of an undated, one-sentence, typewritten letter on blank paper, signed by Noettl over a misspelled typewritten rendition of his name, stating simply that he would be unavailable to attend a trial in November, 1988, "due to other commitments and obligations and time constraints." Caron's principal reliance seems to have been his claim that he was entitled by right to present the testimony of an out-of-State witness by deposition.

(b) *Other discretionary factors.* The more significant reason for the judge's exclusion of the deposition, however, was its form. As the judge pointed out, Noettl was deposed by General Motors for discovery purposes: to ascertain the materials on which he might be basing any opinions he might

---

[10]In the *Air Crash Disaster* case, the court (at 1502) suggested that, in applying discretion, it would balance various factors "toward the ends of fairness: (1) offeror's need for the evidence to be presented through the deposition, (2) opportunity provided the opponent to cross-examine the deposition witness on those issues, (3) nature of the evidence to be presented, (4) jury's need to observe the demeanor and credibility of the witness, and, (5) actual unavailability of the witness, as distinguished from mere geographic distance from the courthouse." We would add, as well, the surprise occasioned to the opposing party, where the possibility of presentation through deposition has not been contemplated from the start.

have formed and the reasoning underlying them. Little if anything brought out in General Motors' examination of Noettl was helpful to Caron's case,[11] with the exception of a conclusion that Noettl had formed, based on materials supplied to him by Caron's counsel, that the car's speed at the time of the collision with the large tree was only ten to twenty miles per hour. The useful (to Caron) testimony came out during a short "cross-examination" of Noettl by Caron's counsel, in response to a series of objected-to highly convoluted and sometimes unintelligible leading questions that the judge (as he indicated) would have excluded, or required to be rephrased, if they had been asked at the trial.

The judge expressed doubt, moreover, whether the opinions were not speculative, if predicated on the paucity of factual data that the expert gave as their sole basis. Compare *Reed* v. *Canada Dry Corp.*, 5 Mass. App. Ct. 164, 166 (1977), with *Fourth Street Pub., Inc.* v. *National Union Fire Ins. Co.*, 28 Mass. App. Ct. 157, 161-162 (1989). The speed at the point of collision with the large tree, for example, ten to twenty miles per hour, was calculated from the car's speed when it left the road (fifty to fifty-five miles per hour, told to Noettl by the plaintiff's counsel) and its curved path of travel (as depicted in the diagram in the police accident report) to its point of collision with the large tree 175 feet later. Noettl made assumptions as to steer input and acceleration or deceleration (he assumed the plaintiff removed his foot from the accelerator as soon as the car left the road and that he did not apply brakes), and from this, coupled with the assumed friction of a terrain he had never seen, calculated a deceleration force of .5G's over the 175 feet to arrive at the low point of impact speed. Comparing this type of fine calculation with Noettl's acknowledged inability to tell from the information he had received whether the LeSabre had taken half a roll or one and a half rolls before colliding with the large tree, we think that the judge could very reasonably have arrived at his conclusion that "[t]he preparation by [Noettl] and his

---

[11]Noettl gave no support to Caron's original theory that the LeSabre's door latch design was defective.

familiarity with the necessary facts did not commend his effort to being presented by deposition. As the key expert witness in a products liability case, I believed it was quite important [that] his testimony be heard orally in open court." This, in our view, was a proper exercise of discretion.

3. *Directed verdicts.* There is a further reason why the plaintiff's appeal is hopeless. The Noettl deposition, even if it had been received in evidence, would not have sufficed to establish that the plaintiff's injuries resulted from a design defect in his LeSabre.[12]

The plaintiff, it will be recalled, presented his case on the theory that the 1975 LeSabre was defectively designed, in violation of the implied warranty of merchantability.[13] To make out this claim, Caron needed to prove (1) that crashes such as the one he experienced on February 24, 1984, were reasonably foreseeable to the manufacturer; (2) that the design of the 1975 LeSabre made it unreasonably dangerous for use in the circumstances of such a crash; and (3) that because of the design he was injured more seriously than he would have been had the car been reasonably designed. See *Back* v. *Wickes Corp.*, 375 Mass. 633, 638-642 (1978). "In evaluating the adequacy of a product's design, the jury should consider, among other factors, the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design." *Id.* at 642. *Fahey* v. *Rockwell Graphic Sys., Inc.*, 20 Mass. App. Ct. 642, 651 (1985).

The Noettl deposition, had it been admitted, would have left the plaintiff's evidence insufficient to warrant an inference that the 1975 LeSabre was inadequately designed. In

[12]"[O]bjection may be made at the trial or hearing to receiving in evidence any deposition or part thereof for any reason which would require the exclusion of the evidence if the witness were then present and testifying." Mass.R.Civ.P. 32(b), 365 Mass. 787 (1974).

[13]The complaint contained two counts alleging negligent design, but those counts were waived at the time of trial.

particular, there was no evidence showing "the gravity of the danger posed by the challenged design," or "the likelihood that such danger would occur." Two possible design defects were suggested by the plaintiff's proffered evidence: first, that the door design permitted it to come open during the accident, and second, that the LeSabre's structure was insufficiently rigid, causing excessive deformation during the collision. As to each alleged defect there was a complete absence of proof, even with the Noettl deposition, regarding the danger posed by the 1975 LeSabre as it was actually designed. Although Noettl testified that car doors generally should not come open during rollover collisions, and that cars involved in collisions such as the plaintiff's should not be crushed as badly as the LeSabre actually was,[14] he had never examined the design of the LeSabre's door latch or its frame. He therefore could not (and did not) testify regarding the likelihood that the car door, as designed, would come open in such an accident, or that the LeSabre, as designed, would be severely crushed in such an accident. The evidence left open the possibility that the vehicle was designed to an extraordinary degree of safety and that the door opening and crushing were the result of an extraordinary accident.

Lacking evidence of the level of danger posed by the 1975 LeSabre's design, the jury could not weigh the dangers of the vehicle as designed against the costs of implementing a less dangerous design, and consequently could not perform the balancing required by *Back* v. *Wickes, supra.* Compare *Walsh* v. *Atamian Motors, Inc.,* 10 Mass. App. Ct. 828, 829 (1980) (mere occurrence of automotive problems, standing alone, was insufficient to show existence of defect). The verdicts were properly directed in favor of the defendants.

*Judgment affirmed.*

---

[14]Noettl, it will be recalled, had predicated that the LeSabre's speed was under twenty miles per hour at its impact with the large tree.

BROWN, J. (concurring). I fully concur in the careful analysis and sound reasoning set forth in the court's comprehensive treatment of the issues raised in this case. I write separately only to suggest that the judge could and should, have pulled the plug on this case before it came to trial and to make a few observations regarding the discovery process.

Manifestly, the trial judge did not err in directing verdicts for the defendants. No rational trier of fact could have found that the duty to design a passenger automobile for ordinary use encompasses a duty to protect from injury an intoxicated operator who drives the vehicle off the road at a speed of fifty miles per hour and travels another 175 feet, rolling over and striking several objects before coming to rest against a tree. This conclusion should have been apparent before trial.

As the majority points out in footnote 5, *supra*, "[t]he requests for admissions in this case were facially excessive, burdensome, and oppressive." This is discovery run amok. In his recent book, The Betrayed Profession (1994), Sol Linowitz (at 178) makes special reference to this precise abuse and the resultant greatly increased expense to the parties and society if it is left unchecked:

> "If a judge thinks it highly unlikely that a plaintiff can prevail, he has an obligation to the defendants, to the schedule of his court, and to other applicants for justice -- and, indeed, to the plaintiff -- not to permit the waste of their time and money. A courtroom should not be a casino where lawyers throw the dice in hopes that a jury will read them wrong."

At the end of these comments, Mr. Linowitz remarks, quite appropriately, that "[as] always, there must be worries about what happens when judges are given discretion." One of the functions of an appellate court, of course, is to correct abuses of judicial discretion.

In today's litigation arena, depositions and other forms of discovery have become the main sources of abuse by advocates. I agree with the remarks of former Chief Justice Warren Burger, who observes that discovery "has become trial by

annihilation before the litigants ever reach the courthouse." The Betrayed Profession, *supra* at 169, quoting from W. Burger, Delivery of Justice 143 (1990).

This case is a shining example of wasting considerable amounts of energy and money on a factually frivolous lawsuit. It is no wonder that the public's chief perceptions of the legal profession are ones of distrust and cynicism, frustration and even anger.

This may be anathema to those who love litigation, whether it be complex or routine, and the attendant billable hours, but it must be said: Discovery needs an overhaul. However, when deliverance comes, and it surely must, the utmost care must be taken not to achieve gridlock in its stead. That will be a challenge, but we must undertake it. Responsibility for curtailing this abuse falls upon the bench as well as the bar.

I close with this prophecy: If we fail to put our collective judicial fingers in the dike *immediately*, we shall need to summon Noah because we shall certainly need his ark.